OPINION
{¶ 1} This is an appeal from the Geauga County Court of Common Pleas, Juvenile Division, terminating a mother's parental rights and granting permanent custody of her two children to a county department of job and family services. Because we hold the record fails to reveal clear and convincing evidence in support of the trial court's decision, we reverse.
 {¶ 2} In the summer of 2001, Geauga County Job and Family Services ("GCJFS" or "agency") received a dependency referral pertaining to appellants, Ashlynn and Austin Janson ("children"), born on January 1, 2001. This initial case was closed after thirty days. Some two months later, a second case was opened alleging physical abuse. After investigation, the allegations were found unsubstantiated and no complaint was filed. The agency maintained an open file on the Janson family through April 1, 2004 when their case file was closed. During the pendency of this second case, the court issued a no contact order between Jeff Janson, Jr., ("father") the children's father, and the children. Although the record does not reflect father ever physically harmed the children, the order was a result of two prior domestic violence charges of which Jade Fulop-Janson ("mother") was the victim.
 {¶ 3} Approximately twelve days after GCJFS closed the second case, the agency received another referral regarding the Janson children. On April 19, 2004, Tricia Dunlap, a caseworker for the agency visited mother's residence and discovered father at the house with mother and the children. As a result of Dunlap's visit, GCJFS filed a complaint on April 26, 2004 alleging the children to be neglected pursuant to R.C. 2151.03(A)(2) and (3) and dependent pursuant to R.C. 2151.04(B) and (C). The complaint contained allegations that (1) the home was cluttered with beer bottles and cigarette ashes littering the floor; (2) mother admitted to using crystal methamphetamine, and (3) mother "indicated" she allowed unsupervised contact between the children and their father. Mother initially entered a plea of "not true" and on April 30, 2004, the trial court ordered the children placed in the temporary custody of GCJFS.
 {¶ 4} On June 11, 2004, GCJFS amended the complaint by deleting its allegation that mother allowed the children to have unsupervised contact with their father. Mother subsequently entered a plea of "true" and the court found the children to be neglected and dependent pursuant to the foregoing statutory provisions. In the order, the court permitted mother two hours supervised weekly visitation. The juvenile court further adopted the case plan filed on May 17, 2004 and continued the no contact order between father and the children.
 {¶ 5} Pursuant to her case plan, mother was to: (1) obtain and maintain stable employment and a stable and clean residence; (2) allow no contact between father and the children; (3) complete a psychiatric evaluation and attend all scheduled sessions and follow all recommendations of the evaluation; (4) complete a drug and alcohol assessment and follow all recommendations of her counselor.
 {¶ 6} A review hearing was held on October 25, 2004 during which a second review hearing was scheduled for January 24, 2005. However, prior to the second review hearing, on January 7, 2005, GCJFS filed a motion for permanent custody. A hearing on the motion was scheduled for March 10, 2005. The hearing was ultimately continued. In the interim, mother filed a motion for custody on April 13, 2005 and the paternal grandparents filed the same on May 2, 2005. The permanent custody hearing commenced on May 5, 2005 and lasted four days.
 {¶ 7} At trial, the agency first called Benjamin Rosen, Ph.D., a licensed professional counselor with the American Association of Christian Therapists with doctorates in ministries and biblical counseling. Dr. Rosen testified he met mother and father at a yard sale in the summer of 2002. He commenced counseling the parties utilizing a "faith based" counseling model. While Rosen indicated there was little unity between the couple at first, after a period of counseling he noticed a great deal of progress, particularly with mother. Eventually on March 26, 2004, Rosen recommended GCJFS close the Janson case and "that Jade and the children be given full autonomy to grow as a family."[1] On April 1, 2004, mother was awarded custody of the children. After having custody returned, mother stopped her counseling sessions with Rosen and, in his words, "fell off the face of the earth."
 {¶ 8} Richard Hill, M.D., Ph.D., Medical Director and Staff Psychiatrist at Ravenwood Mental Heath Center, testified next. Dr. Hill testified he met mother in September 2004, for a psychiatric evaluation. During the evaluation, mother reported she took crystal methamphetamine which was provided by father; however, she related she stopped taking the drug on April 27, 2004 due to the problems it caused in her life. Mother further described her home life as a child as "a pleasurable experience." However, evidence ultimately indicated mother's childhood was somewhat dysfunctional and less than idyllic.[2] Dr. Hill testified psychotherapy "would not be an acute recommendation" but mother "might consider" psychotherapy in the future, after
her more immediate needs, viz., getting her children back, are addressed. Dr. Hill concluded mother exhibited no acute psychological disorders and had no chemical dependencies.
 {¶ 9} Cheryl Breen was GCJFS' next witness. Breen is an employee with Champion Personnel, a job placement agency. On November 23, 2004, mother submitted her application to Breen who obtained employment for her at Dillen Products on December 9, 2004. According to Breen, mother stated father was her ex-husband;[3] Breen testified mother referred father to Champion for employment and came to Champion with him on one occasion.
 {¶ 10} Alisha Mitten, Staffing Coordinator at Champion, testified she spoke with mother regarding her referral of father. With respect to this referral, Mitten was instructed by mother to call her cell phone if she wished to contact father. Nonetheless, Mitten testified mother stated she would prefer not working with father because "her parents wouldn't be happy." Mother was eventually released from Dillen Products on January 5, 2005 for "packing bad parts" and "a bad attitude."
 {¶ 11} In February, 2005, mother began work at a factory known as New Methods. According to Laurie Hauser, office manager for New Methods, mother was hired as a press operator. Hauser further testified that father was hired by New Methods on or about March 1, 2005. In his application, father listed mother as a reference. Hauser approached mother regarding father and his work habits. Mother acknowledged she had a good relationship with father and related she saw no reason why father could not work at New Methods. Father was eventually hired but quit after about four weeks. With respect to mother's and father's relationship, Hauser testified she had no knowledge regarding whether the parties lived together and received no reports that father was around the children.
 {¶ 12} After becoming employed at New Methods, mother leased an apartment, with her mother, Mary Hess-Fulop, at Middlefield Apartments. Kassandra Lehman, the Officer Manager for Middlefield Apartments, testified she knew father and had observed him entering and leaving mother's apartment building. However, Lehman testified she was unaware father had children and never saw him with children. Lehman further noted she had not observed father in mother's building since a noise complaint on April 8, 2005. At the time of the hearing, mother was still employed at New Methods[4] and, despite falling behind one month on rent, still resided at Middlefield Apartments.[5]
 {¶ 13} Tracy Olszowy, a child support case manager for GCJFS, testified that mother's child support obligation for Austin is $162.83 per month. As of April 30, 2005, her arrearages are $1,188.70. Mother's support obligation for Ashlynn is also $162.83 per month. As of April 30, 2005, the arrearage was $1066.30. Although these are the technical existing arrearages for the children, Olszowy conceded mother did not have sufficient income to pay the support obligations as they were ordered. According to Olszowy, when an obligor encounters this problem, the employer receives a wage withholding order and garnishes 60% of the obligor's net income towards the support obligation. At the time of the hearing, Olszowy testified that the agency was "processing" mother's case pursuant to this scheme.
 {¶ 14} Next, "Sandra," the children's foster mother, testified the children were placed with her on April 20, 2004 and visited their mother consistently. Early in this placement, Sandra testified the children complained of stomach upsets before visiting their mother. When Sandra would arrive to retrieve the children, they would "scream and cry and hang onto their mom and not want to leave." According to Sandra, after visitations, the children "used to be just bouncing off the walls and just going crazy because they would be with their mom." As of the hearing, Sandra testified mother had been working with the children and ever since the children have been "coming home really well."
 {¶ 15} Sandra emphasized she was working with the agency and with mother towards the goal of reunification. Sandra testified the children love their mother very much and become sad after their visits end. Sandra underscored that she and mother have occasion to communicate via e-mail regarding, inter alia, the children's behavior and routines. Sandra testified mother asks about the children "all the time."
 {¶ 16} Gina Schultz, a GCJFS social worker and clinical supervisor of the "Help Me Grow" Program, testified she had worked with the Janson family on a voluntary basis in an earlier case and with mother in the current case. When the instant case was opened, mother was living and working in New York. According to Schultz, mother stated she had been staying with Jeff Janson, Sr., who helped her get the job. However, evidence revealed Janson, Sr., did not live in New York with her and, in fact, father was the individual with whom she lived. Schultz testified mother adamantly denied living with father.
 {¶ 17} According to Schultz, mother also maintained she had no contact with father from January 2005, through the time of the hearing. In Schultz's view, contact with father was not necessarily a problem. Rather, the issue was mother's lack of honesty in relation to her association with father. Schultz also testified she did not believe mother was honest about certain features of her employment and details pertaining to her residence, i.e., according to Schultz, mother lied to her about how she lost her job at Dillen Products and misrepresented to GCJFS that Mary Fulop-Hess, mother's mother, was a "guarantor" on her apartment rather than a tenant.
 {¶ 18} With respect to mother's case plan objectives, Schultz testified mother still exhibited instability: Although mother had been working at New Methods since February of 2005, Schultz noted mother had numerous other jobs before her current employment. Moreover, Schultz testified mother's residential status had ostensibly stabilized since January, 2005, she had lived in a variety of places before this. However, Schultz conceded mother had completed the requisite psychological evaluation with Dr. Hill and had attended counseling. Further, Schultz noted mother had submitted to a drug and alcohol assessment and all drug tests since the opening of the case had been negative.
 {¶ 19} Michelle Laurin, a social worker for GCJFS assigned to mother's case on June 23, 2004 testified mother had lived in six residences while she was involved in the case and had four jobs.[6] According to Laurin, GCJFS made certain changes to mother's caseplan in October of 2004. The changes required mother to participate in counseling twice a month and address her issues with deception. Laurin underscored, however, mother did not attend counseling from "sometime in October until late December." However, with respect to her absence, Laurin testified:
 {¶ 20} "[Jade] said that she talked to [her counselor] and she said that [her counselor] said to her that she didn't need to be in counseling.
 {¶ 21} "Jade made an appointment with her counselor. She then told me that she apologized and misunderstood what her counselor had said. That her counselor said that she didn't need to see her, that she could see someone else. And from then on after Jade was back in counseling."[7]
 {¶ 22} Michelle Rutti, a former social worker with GCJFS who worked on mother's case until May 18, 2005, testified she observed between eight and ten visits between mother and the children. Rutti testified she was initially concerned because, in her view, mother did not have significant interaction with the children. However, Rutti also testified, as the visits progressed, the children responded well to mother, sought to please her, would sing songs for and with her, and were sad at the end of their visits. Moreover, Rutti testified mother made big improvements regarding the "appropriateness" of her interaction with the children.
 {¶ 23} Kathy Briggs, guardian ad litem for the children, had several occasions to observe mother and the children interact. Briggs testified the children were always happy to see mother, but mother had difficulty controlling them during visits. While this concerned Briggs, she noted supervised visitations are "unnatural" and fundamentally affect the interaction of the parties being observed. In this respect, Briggs believed unsupervised visitation should have been explored as early as January of 2005 and testified, at the time of the hearing, she did not believe visitations would "necessarily have to remain supervised."
 {¶ 24} In general, Briggs acknowledged mother has made progress in her case plan and has created and maintained a stable living and occupational environment since January, 2005. Nonetheless, Briggs believed mother was unable to offer the children financial stability and consistency. Briggs also expressed concern regarding father's role, if any, in mother's life. Accordingly, Briggs recommended permanent custody be granted to GCJFS.[8]
 {¶ 25} Fran Zamore, mother's counselor since August 2, 2004, testified their therapy sessions were focused on accomplishing the goals of the case plan in order for mother to have custody of the children returned to her. Zamore stated mother made good progress toward the goals of her case plan and believed she has learned lessons from her experiences and would not repeat the same mistakes. Zamore lauded mother for "moving in the right direction" stating mother was making "terrific strides." In Zamore's view, mother's progress entitled her to the opportunity to have unsupervised visits with the children. Zamore believed the agency's failure to move in this direction was destructive and belied the purported goal of re-unification. Zamore testified: "you have a woman who has not had reasonable access to her children from my perspective who has done what she's needed to do in order to have access to her children. Kids, as I understand, kids were taken away from her because she was using drugs. She's not using drugs and she still doesn't have her kids." Zamore continued:
 {¶ 26} "I am very distressed that the visitation is still supervised, and that it is so limited. * * * I really think that we set people up to fail, if we keep such a tight fist on them and then all of a sudden everything's open."
 {¶ 27} Zamore testified mother is able to parent her children, is highly motivated by her children, has made numerous changes, and has greater foresight with respect to her own decision-making. Under the circumstances, Zamore believed mother should receive more time and less supervision during her visitation sessions.
 {¶ 28} Zamore further challenged the messages the agency was sending by involving so many individuals in mother's case. Pursuant to her case plan, GCJFS emphasized consistency in mother's lifestyle and behavior. However, the agency involved no less than six social workers to observe and assess mother. With so many case workers involved, each with her own particular assessment practices and unique perspective as to the propriety of mother's behavior and interaction, mother had no foundation upon which she might build consistency.
 {¶ 29} Zamore additionally testified she did not believe mother was a "liar;" although one goal of her amended case plan indicated she needed to work on being more honest, Zamore believed mother's lack of technical honesty was a coping strategy, i.e. appellant tended to minimize negatives in order to be accepted, under the circumstances, by the agency and the various case workers and professionals involved in her case. In Zamore's view, GCJFS placed too much emphasis on comparatively insignificant issues (such as the type of food mother brought to her visitations and her failure to be completely forthright regarding her contact with father) and too little emphasis on the significant issues of parenting and her ability to parent.
 {¶ 30} The hearing concluded on June 27, 2005. On July 11, 2005, after considering the evidence, the juvenile court filed its judgment entry granting permanent custody to GCJFS. In its judgment entry the court found the children had been in the custody of the agency for twelve of twenty-two consecutive months and that permanent custody to the agency was in the children's best interests. The children now appeal and assert the following assignments of error:
 {¶ 31} "[1.] The trial court erred by granting GCJFS' motion to terminate the parental rights of the mother by determining the case on factors that fall outside of the statutory scheme and by relying on evidence that should have not been admissible.
 {¶ 32} "[2.] The trial court erred by granting the motion for permanent custody based on evidence that was irrelevant and improperly admitted.
 {¶ 33} "[3.] The trial court erred by granting the motion for permanent custody utilizing a requirement that was ultimately a violation of the mother's fundamental constitutional rights.
 {¶ 34} "[4.] The trial court erred by granting the motion for permanent custody as it was against the manifest weight of the evidence.
 {¶ 35} "[5.] The trial court erred by failing to grant custody to the paternal grandfather."
 {¶ 36} Before a court can terminate a parent's rights, it must find, by clear and convincing evidence, both prongs of the permanent custody test. First, the court must find one of the following: That the child is abandoned, orphaned, has been in the temporary custody of the agency for at least twelve months of the prior twenty-two months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an examination of the factors under R.C. 2151.414(E). See R.C. 2151.414(B)(1)(a)-(d) See, also, InRe Smith, 11th Dist. No. 2002-A-0098, 2003-Ohio-800, at ¶ 8.
 {¶ 37} If the juvenile court determines that one of the four circumstances in R.C. 2151.414(B)(1)(a) through (d) is present, then the court continues with an analysis of the child's best interest. In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) requires that the trial court consider all relevant factors, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factor in R.C. 2151.414(E)(7) to (11) is applicable.[9] Smith, supra, at ¶ 10. See, also,In Re Litz (Nov. 5, 2001) 11th Dist. No. 2001 Ohio App. LEXIS 5061, 2001-Ohio-8903, at 11.
 {¶ 38} If both prongs of the foregoing test are met by clear and convincing evidence, the trial court may terminate the rights of a natural parent and grant custody of the child to the moving party. Clear and convincing evidence is more than a mere preponderance of evidence. Instead, it is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. In reHolcomb (1985), 18 Ohio St.3d 361, 368.
 {¶ 39} Because the children's first and second assignments of error challenge the trial court's application of the facts to the law under R.C. 2151.414(B), the first prong of the permanent custody test, we shall address them mutually. Fundamentally, the children argue the trial court's finding pursuant to R.C.2151.414(B)(1)(a) is grounded upon inadmissible evidence and its justification for the finding unsupported by the requisite statutory analysis under R.C. 2151.414(E).[10] We believe any error committed by the trial court was harmless.
 {¶ 40} Specifically, under R.C. 2151.414(B)(1), a court need only find, by clear and convincing evidence, one of the enumerated scenarios set forth under subsections (a) through (d). See, Smith, supra; see, also Litz, supra, at 12. In the instant matter, the trial court made two findings: (1) "the children can not be place [sic] with their mother within a reasonable period of time and should not be placed with their mother[,]" see R.C. 2151.414(B)(1)(a); and (2) the children "have been in the temporary custody of GCJFS for more than twelve months of the twenty-two months immediately preceding the filing of the permanent custody motion." See R.C. 2151.414(B)(1)(d).
 {¶ 41} Although the court did make a finding of "unfitness" pursuant to R.C. 2151.414(B)(1)(a) we need not engage in a thorough analysis of this finding because it's finding under R.C.2151.414(B)(1)(d) is supported by clear and convincing evidence. Appellant's first and second assignments of error lack merit.
 {¶ 42} Under their third assignment of error appellants contend the trial court's consideration of mother's contact with father as a basis for terminating her parental rights infringes upon her basic constitutional rights.
 {¶ 43} We first question the children's standing to assert an alleged violation of mother's rights. "`It is well established in Ohio that an appeal lies only on behalf of a party aggrieved. Such party must be able to show that he had been prejudiced by the judgment of the lower court."' In re Jacobberger, 11th Dist. No. 2003-G-2538, 2004-Ohio-6937, at ¶ 55, quoting, Love v.Tupman (In re Guardianship of Love) (1969), 19 Ohio St.2d 111,113. The appealing party has the burden of demonstrating that his or her rights have been adversely affected by the trial court's judgment. Id. Under the circumstances, the children do not argue how they were prejudiced by the alleged violation of mother's rights and we perceive no obvious injury in fact. Therefore, we believe the children lack standing to raise this issue.
 {¶ 44} However, assuming the children could somehow demonstrate prejudice resulting from the alleged violation of mother's constitutional rights, we hold their argument meritless.
 {¶ 45} Marriage is a fundamental right protected by the due process clause of the Constitution. Pena v. Northeast OhioEmergency Affiliates, Inc. (1995), 108 Ohio App.3d 96, 109; see, also Loving v. Virginia (1967), 388 U.S. 1, 12. Accordingly, a governmental act infringing upon this right may be invalidated unless the state can demonstrate the act is narrowly tailored to promote a compelling interest. See, Beatty v. Akron CityHospital (1981), 67 Ohio St.2d 483, 492. The children argue the agency's case plan and the court's various orders had the practical effect of compelling mother to have no contact with father, her husband. The children maintain the agency failed to set forth a compelling interest to support the foregoing infringement and thus compromised the exercise of mother's fundamental right.
 {¶ 46} While the agency and the court expressed concern about mother's ongoing contact with father throughout the case, the concerns, as articulated by the court in its July 11, 2005 judgment entry, involved exposing the children to a "continuing cycle of domestic violence and drug abuse." In fact, the court issued a "no contact" order between father and the children (not mother and father) as a result of father's propensity for domestic violence against mother and the possible harm, whether physical or emotional, it might cause the children. Mother was never forbidden from seeing father. Furthermore, Gina Schultz, a clinical supervisor for the agency, encouraged mother to keep her job at Dillen even though father had recently commenced employment there. Schultz further underscored that the agency was not necessarily concerned about her contact with father; what was important to the agency was mother's honesty about her contact with father.
 {¶ 47} In our view, neither the agency nor the court infringed upon mother's right to marriage or association. If the situation presented itself, the case plan merely required mother to "not allow" contact between father and the children. Moreover, the agency, through Schultz, indicated it did not prohibit contact between mother and father, only that mother communicate honestly about her contact with father. As we can discern no court or agency action upon which the children could premise their allegation of an infringement of mother's rights, their third assignment of error is without merit.
 {¶ 48} We shall next address the children's fifth assignment of error as it dovetails well with our initial analysis of their third assigned error. Under their fifth assignment of error, the children argue the trial court erred by failing to grant custody to the paternal grandfather.
 {¶ 49} Like their argument under their third assignment of error, the children attempt to assert the rights of another party without an affirmative demonstration of prejudice. Clearly, Jeff Janson, Sr., the paternal grandfather, was the party directly aggrieved by the trial court's failure to grant him and his wife custody. However, Janson, Sr., did not file an appeal. While the children may have had some abstract desire to be placed with Janson, Sr., the frustration of that desire does not automatically afford them standing to assert his rights.
 {¶ 50} However, even if the children had standing, we believe the trial court did not err in refusing to grant Janson, Sr., custody. The court heard testimony from Janson, Sr., and considered his motion for custody. In its judgment entry, the court stated:
 {¶ 51} "The children have had very little interaction with either the paternal grandfather or the paternal step-grandmother. They have met the paternal step-grandmother on one occasion. Prior to his involvement in this case, paternal grandfather last visited with his grandchildren approximately two years ago, in January of 2003. Although the children's paternal step-grandmother was included in the motion for custody filed on May 5, 2005, she has communicated to the guardian ad litem that it is not her desire to be a primary caretaker for these two four year old children."
 {¶ 52} The court continued:
 {¶ 53} "While it is possible that a permanent placement could be achieved by placing the children in the home of their paternal grandfather and paternal step-grandmother, the court finds that the children would be better served by placing them in a home where both of the prospective caretakers are committed to raising the children as their own. In this case, the paternal step-grandmother has made it clear to the guardian ad litem that she is not prepared to make that commitment."
 {¶ 54} The court's determination was supported by clear and convincing evidence. Hence, the children's fifth assignment of error is without merit.
 {¶ 55} In their fourth assignment of error, the children allege the trial court's decision to award permanent custody to the agency is against the manifest weight of the evidence.
 {¶ 56} A reviewing court will not overturn a trial court's finding on a manifest weight challenge if the record contains competent, credible evidence supporting the trial court's factual findings. In re S. (1995), 102 Ohio App.3d 338, 345.
 {¶ 57} The children first argue the agency failed to demonstrate and the court failed to provide a clear basis for a determination of mother's "unfitness," pursuant to R.C.2151.414(B)(1)(a). As we discussed in our analysis of appellant's first and second assignments of error, R.C. 2151.414(B)(1) does not require a trial court to make a finding of unfitness under R.C. 2151.414(B)(1)(a) before moving forward with its analysis of the child's best interests. So long as the trial court finds, by clear and convincing evidence, one of the four factors under R.C.2151.414(B)(1), its conclusion under the first prong of the permanent custody analysis will not be disturbed. See, In reStillman, 155 Ohio App.3d 333, 341, 2003-Ohio-6228.
 {¶ 58} Here, the court concluded that the children "have been in the temporary custody of GCJFS for more than twelve months of the twenty-two months immediately preceding the filing of the permanent custody motion." R.C. 2151.414(B)(1)(d). This finding was sufficient to meet the first prong of the test.
 {¶ 59} That said, we shall next review the juvenile court's conclusion that awarding permanent custody to GCJFS is in the children's best interests. As noted supra, when considering children's best interest, the juvenile court must consider all relevant factors including, but not limited to those specified in R.C. 2151.414(D). We have previously held that the provisions under R.C. 2151.414(D) are mandatory and "must be scrupulously observed." In re Smith, supra, at ¶ 13; see, also, In reLitz, supra, at 11; In re Hommes (Dec. 6, 1996), 11th Dist. No. 96-A-0017, 1996 Ohio App. LEXIS 5515, at 4. The failure to discuss each of the factors set forth in R.C. 2151.414(D)(1) through (5) when arriving at a conclusion concerning the best interest of the child is prejudicial error. Smith, supra at 13; see, also, In re Jacobs (Aug. 25, 2000), 11th Dist. No. 99-G-2231, 2000 Ohio App. LEXIS 3859, at 12-13.
 {¶ 60} The July 11, 2004 judgment entry reveals the trial court considered each of the factors under R.C. 2151.414(D)(1) through (5). However, under the circumstances, an analysis of each factor in question is warranted.
 {¶ 61} With respect to the R.C. 2151.414(D)(1), the interaction and interrelationship of the children with mother, the court engaged in a limited discussion of the nature of appellant's supervised visitation with the children. However, other than making the unremarkable factual finding that mother's visitation was consistently supervised, the court failed to discuss the children's interaction and interrelationship with mother.
 {¶ 62} However, there was ample testimony from the agency's witnesses regarding the strong bond between children and mother: Sandra, the children's foster parent, testified the children "love mom very much." She further testified mother, through e-mails, asks about the children "all the time" and asks Sandra to tell the children she loves them. Further, Michelle Warren, a social worker at GCJFS who worked on mother's case testified the children's interaction with mother was "appropriate" and, in her observations, mother was able to control the children's behavior properly. Kathy Briggs, the guardian ad litem for the children testified the children were always happy to see mother during the visitations she observed. Moreover, Briggs noted the children had occasions to "throw temper tantrums" at day care; however, during her observations of the supervised visitations, she never observed the children acting out in this fashion. As a result, both Briggs and Fran Zamore, mother's counselor, testified they believed unsupervised visits should be explored. None of this evidence is mentioned by the trial court.
 {¶ 63} With respect to R.C. 2151.414(D)(2), the wishes of the children, the court considered those wishes expressed through the guardian ad litem in her report, i.e. Austin stated "he was happy living with the foster parents and that he could continue to live there." While Ashlynn "communicated * * * that she liked living with the foster family, but that she would like to live with her mom `when the Judge lets her.'" The court considered this evidence, however, failed to consider Sandra's testimony that Austin stated he wanted "to live with Mommy."
 {¶ 64} Next, the court gave a detailed summary of the children's custodial history pursuant to R.C. 2151.414(D)(2). However, during its discussion of how the children were brought into the agency's custody in the instant matter, it stated:
 {¶ 65} "Within weeks of the Court terminating GCJFS [sic] involvement, the children were again placed in the temporary custody of GCJFS when it was determined that the mother was consuming illegal drugs, allowing the children to haveunauthorized contact with their father; and that the children were again being exposed to unsanitary living conditions." (Emphasis added).
 {¶ 66} There is no evidence in the record to support the court's finding that mother "allowed" father to have contact with the children. To the contrary, the agency amended its complaint to omit this allegation. Furthermore, Tricia Dunlap, an agency case worker, testified she witnessed father at mother's residence with the children; however, mother "had kept asking him to leave and that he wouldn't do it. And when [I] confronted Mr. Janson about it, he said these are my children. I have every right to see them." Moreover, Michelle Warren, another agency caseworker, testified she was privy to an incident where father showed up at mother's residence desiring to see the children. According to Warren, father had threatened to kill himself and said "it was going to be the last time he ever saw the children." As a result, mother called the police and an ambulance. Warren confirmed mother's story via a police report.
 {¶ 67} As for R.C. 2151.414(D)(4), the court found the children had a strong need for a legally secure permanent placement in a "stable home with loving, nurturing adults." The court noted that permanent placement could be achieved through placing them in the home of their paternal grandfather and paternal step-grandmother; however, it concluded the children would be better served by placing them in a home where both of the prospective caretakers are committed to raising them as their own.
 {¶ 68} While the rights being terminated belonged to mother, the court made no finding as to why placement with her could not be achieved. Evidence at trial indicated that mother loves her children and the children love her. Moreover, mother had maintained stable employment and housing for some six months prior to the hearing. Mother maintained a regular visitation schedule pursuant to her case plan and there was no evidence indicating mother ever "allowed" father around the children. Furthermore, mother had progressed in, if not met, each of her case plan goals.
 {¶ 69} While the trial court nominally followed the statutory machinery of the best interest analysis, it failed to make specific, meaningful findings under R.C. 2151.414(D)(1). Moreover, the court failed to consider relevant evidence pertaining to R.C. 2151.414(D)(1), (2), and (4) adduced at trial by the agency's witnesses and made a finding unsupported by the evidence under R.C. 2151.414(D)(1)(3). In effect, we believe the trial court's "factual" conclusions are unsupported by clear and convincing evidence. "[B]ecause the factors set forth in R.C.2151.414(D) are all relevant to the question of whether a parent should be stripped of permanent custody[,] every one needs to be given proper consideration." Smith, supra, at ¶ 18; see, also, In re Alexander (Dec. 19, 1997), 11th Dist. No. 96-T-5510, 1997 Ohio App. LEXIS 5742, at 6-7. (Emphasis added). As we are permitted to engage in a limited weighing of the evidence on review, we believe the trial court lost its way in concluding, by clear and convincing evidence, an award of permanent custody to GCJFS is in the children's best interests. For these reasons, we sustain the children's fourth assignment of error.
 {¶ 70} For the foregoing reasons, the children's first, second, third, and fifth assignments of error are overruled. However, their fourth assignment of error is sustained. Accordingly, the judgment of the Geauga County Court of Common Pleas, Juvenile Division is hereby reversed and this matter is remanded to the trail court for proceedings consistent with this opinion.
O'Toole, J., concurs, Grendell, J., concurs with Concurring Opinion.
[1] Rosen communicated with GCJFS, via letter, three times between July 2, 2003 and March 26, 2004. Rosen's correspondences included his general concerns and evaluations of the couple and their problems as well as the recommended goals for their counseling relationship.
[2] Jade Fulop-Janson's mother, Mary Fulop-Hess was a purported alcoholic who was married five times.
[3] The couple was married at the time but testimony established appellant desired a divorce.
[4] Appellee states in its brief that, as of the hearing, mother had been terminated from New Methods. The record does not support this claim. Laurie Hauser testified that mother was on a "leave of absence" from work due to an injury to her finger on her left hand which occurred on April 15, 2005. Mother sent documentation from her physician that she would return to work on April 19, 2005. Mother did not attend work on that date. However, Hauser spoke personally with mother who stated she was referred to a specialist and the doctor's office had faxed the documentation to support her absence. Although Hauser had not received the fax, she testified New Methods would "work" with mother because the doctor made the mistake. Hauser testified "as long as [mother] brought the paperwork in, she could come back to work."
[5] Mother had fallen behind on her rent due to her inability to work after her hand injury. On June 7, 2005, Middlefield filed an eviction notice. However, Middlefield accepted a partial payment of mother's back rent and had not filed a new notice. Accordingly, mother is still a standing resident of Middlefield.
[6] Although Ms. Laurin stated her belief that mother had six residences since June 23, 2004, a review of the record indicates she only lists five residences.
[7] Fran Zamore, mother's counselor, was unavailable for counseling during some of the period of mother's absence. Zamore indicated she told mother she did not have to see her, but could see another counselor in the meantime.
[8] Cindy Glazley, Briggs's supervisor and guardian ad litem, testified she agreed with Briggs's assessment regarding the children's need for stability and similarly concluded that permanent custody should be granted to the agency.
[9] R.C. 2151.414(E)(7)-(11) state:
"(7) The parent has been convicted of or pleaded guilty to one of the following:
"(a) An offense under section 2903.01, 2903.02, or 2903.03 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense was a sibling of the child or the victim was another child who lived in the parent's household at the time of the offense;
"(b) An offense under section 2903.11, 2903.12, or 2903.13 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
"(c) An offense under division (B)(2) of section 2919.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;
"(d) An offense under section 2907.02, 2907.03, 2907.04,2907.05, or 2907.06 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
"(e) A conspiracy or attempt to commit, or complicity in committing, an offense described in division (E)(7)(a) or (d) of this section.
"(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.
"(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.
"(10) The parent has abandoned the child.
"(11) The parent has had parental rights involuntarily terminated pursuant to this section or section 2151.353 or2151.415 of the Revised Code with respect to a sibling of the child.
[10] R.C. 2151.414(B)(1)(a) does not explicitly use the phrase "parental unfitness," i.e., the statutory provision permits the court to find that the child "* * * cannot be placed with either parent within a reasonable period of time or should not be placed with the parents * * *." Nonetheless, a finding under this provision is tantamount to a conclusion of unfitness. However, to reach such a conclusion, the court must find by clear and convincing evidence that at least one of the sixteen predicate factors set forth under R.C. 2151.414(E)(1) through (16) is applicable. Here, appellant claims that the court failed to make the requisite finding(s) under subsection (E).