Judgment affirmed in part<br>
and reversed in part,<br>
and cause remanded.

HARSHA and ABELE, JJ., concur.

---

**In re J.W. Jr.; J.W. Sr. et al., Appellants.**

[Cite as *In re J.W.*, 171 Ohio App.3d 248, 2007-Ohio-2007.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

Nos. 06AP–1017 and 07AP–15.

Decided April 26, 2007.

Nigh & Zeidan L.L.C., Tariq H. Zeidan, and Joseph A. Nigh, for J.W. Sr.

Angela M. Lloyd and Jason Macke, for J.W. Jr.

Robert J. McClaren, for Franklin County Children Services.

Karin Demaree, Guardian ad litem for the minor child.

TYACK, Judge.

{¶ 1} J.W. Sr. ("appellant-father" or "father") appeals the juvenile court's decision and entry granting permanent custody of his eight-year-old son, J.W. Jr., to Franklin County Children Services ("FCCS" or "agency"). The decision was issued August 29, 2006. J.W. Jr. ("appellant-child" or "child"), by and through counsel, appeals the judgment separately. Counsel for appellant-child filed a motion to consolidate Nos. 06AP–1017 and 07AP–15, and on January 17, 2006, we granted the motion by judgment entry on the basis that both appeals arise under the same transaction or occurrence and common nucleus of operative facts.

{¶ 2} The child was born February 11, 1999. Just prior to his fourth birthday, an agent for the Ohio Youth Advocate Program ("OYAP") filed a complaint in juvenile court alleging the child was abused, neglected, and dependent, under R.C. 2151.031(C) and (D), 2151.03(A)(2), and 2151.04(C). The allegations in the complaint were related by a children's hospital physician who found several bruises on the child's body, in various stages of healing, about which the doctor concluded, "Abuse can't be ruled out." The child's mother, who is now estranged, had an apparent drug problem as well as several criminal convictions for, inter alia, child endangerment and loitering for prostitution.

{¶ 3} On March 11, 2003, the matter came for hearing before a juvenile court magistrate. The juvenile court adopted the magistrate's decision finding that the child was abused under R.C. 2151.031(C) and (D). The charges of neglect and dependency were dismissed. The court granted temporary court custody ("TCC") to FCCS, adopted the agency's case plan, and ordered an annual review to evaluate the parents' progress toward completing the plan. The purpose of the agency's case plan was to rectify parenting deficiencies so that the child could be reunited with his parents. The case plan required both parents to attend various types of counseling, anger management, and housekeeping-type work-shops, and to maintain full-time employment. OYAP was supposed to assist the parents in each area, including employment assistance. Additionally, the mother was required to seek drug counseling and to submit to drug screening.

{¶ 4} During the time the child was in TCC, his father visited him regularly, and the record demonstrates that the father substantially complied with the case plan until its scheduled annual review on January 8, 2004. The mother did not regularly visit her son.

{¶ 5} Following the annual review hearing, the magistrate issued a new decision acknowledging the father's progress but nonetheless recommending that TCC be extended six months, on the basis that the father had not yet secured

appropriate housing or full-time employment. The extended period of TCC would have expired on or about July 11, 2004.

{¶ 6} On March 1, 2004, FCCS filed a motion seeking permanent court custody ("PCC") under R.C. 2151.413 et seq.

{¶ 7} FCCS's motion languished in the trial court for more than two years. The court granted at least 13 continuances, citing a variety of circumstances to justify the extraordinary delay: failure of service on the parties (mainly with respect to the mother), the judge's availability, appointing counsel for the parties, change of the guardian ad litem ("GAL"), and GAL illness.

{¶ 8} Shortly before the final hearing, the father got engaged. The father's fiancée, Sharon Dixon, is a retired nurse who lives in Oklahoma. Ms. Dixon testified at the PCC hearing that she had made plans for her fiancé and his son to move to Oklahoma where she could share her three-bedroom home. Ms. Dixon also testified that she believed one of her adult sons could help her fiancé find steady work. Id.

{¶ 9} The motion for PCC was finally heard on August 29, 2006. The court found that the father had completed all but two requirements in the case plan, but nonetheless granted FCCS's motion for permanent custody of the child.

{¶ 10} The father filed a timely notice of appeal with this court, raising a single assignment of error for our review:

The trial court's decision terminating appellant's parental rights to his child was not supported by clear and convincing evidence.

{¶ 11} Counsel for the child also filed a timely notice of appeal, raising the following assignments of error:

[I]   The trial court's decision to terminate [J.W. Jr.'s] familial relationship with his father was not supported by clear and convincing evidence.

[II]   R.C. 2151.414(B)(1)(d), permitting the court to grant permanent custody of [J.W. Jr.] to [FCCS] simply because he had been in temporary custody of the agency for twelve of a consecutive twenty-two month period, is unconstitutional.

[III]   The trial court erred in granting permanent custody of [J.W. Jr.], to [FCCS] because [J.W. Jr.] was only in the legal custody of FCCS for ten months.

{¶ 12} The child's first assignment of error is substantially similar to the father's sole assignment of error, and because both are based on the same facts, we address them together.

{¶ 13} The right to parent one's children and maintain and pursue intimate familial associations are fundamental rights guaranteed by the Due

Process Clause of the United States Constitution. See, e.g., *Troxel v. Granville* (2000), 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49; *Moore v. E. Cleveland* (1977), 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531. Ohio recognizes these well-established fundamental rights as well. See, e.g., *In re Hayes* (1997), 79 Ohio St.3d 46, 48, 679 N.E.2d 680; *In re Murray* (1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169; *In re Day* (Feb. 15, 2001), Franklin App. No. 00AP–1191, 2001 WL 125180. Indeed, the Supreme Court of Ohio analogizes the termination of parental rights as " 'the family law equivalent of the death penalty.' " *In re Hayes* at 48, 679 N.E.2d 680, quoting *In re Smith* (1991), 77 Ohio App.3d 1, 16, 601 N.E.2d 45.

{¶ 14} Consequently, the United States Supreme Court holds that before any court may completely and irrevocably sever a parent's rights in his natural child, "due process requires that the State support its allegations by at least clear and convincing evidence." *Santosky v. Kramer* (1982), 455 U.S. 745, 747–748, 102 S.Ct. 1388, 71 L.Ed.2d 599; *see M.L.B. v. S.L.J.* (1996), 519 U.S. 102, 118, 117 S.Ct. 555, 136 L.Ed.2d 473. The General Assembly codified the clear-and-convincing standard in R.C. 2151.414 et seq., which has been upheld by the Supreme Court of Ohio and followed by this court. See, e.g., *In re William S.* (1996), 75 Ohio St.3d 95, 97, 661 N.E.2d 738; see, also, *In re Day.* Thus, we review the record of the juvenile court's proceedings to determine whether the court complied with Ohio's statutory requirements and whether its decision was supported by clear and convincing evidence. See *In re Adoption of Holcomb* (1985), 18 Ohio St.3d 361, 368, 18 OBR 419, 481 N.E.2d 613.

{¶ 15} Slightly less stringent than "proof beyond a reasonable doubt," the clear-and-convincing standard carries the highest burden of proof that can be required in a civil proceeding—defined as more than a mere preponderance of the evidence, clear and convincing evidence is that which is sufficient to establish a firm belief or conviction as to the facts sought to be established. *Cross v. Ledford* (1954), 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118, paragraph three of the syllabus.

{¶ 16} PCC proceedings are governed by R.C. 2151.414, which provides a two-pronged, multipart analysis that must be proven, by clear and convincing evidence, before a court can issue an order terminating a parent's rights under R.C. 2151.413. See *In re Day.* The court must hold a hearing to determine whether permanent custody is in the best interests of the child. See R.C. 2151.414(A). If the court finds, by clear and convincing evidence, that permanent placement is in the child's best interest, the court must also find that one of the circumstances in R.C. 2151.414(B) applies before a motion seeking PCC can be granted. R.C. 2151.414(B) has its own set of factors for determining whether the

child can or cannot be placed with his parents within a reasonable period of time. See R.C. 2151.414(E).

{¶ 17} Determining the child's "best interest" is a prerequisite to making findings to terminate parental rights. The best-interest criteria are outlined in R.C. 2151.414(D):

(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;

(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(5) Whether any of the factors in divisions (e)(7) to (11) of this section apply in relation to the parents and child.

{¶ 18} The trial judge here carefully considered subsections (1), (2), and (3). The trial court correctly found that father and son were "bonded." The court also found that the child had bonded with his foster family. Further, the court found that the child's wishes, as related by the GAL and the child's attorney, were such that he clearly wanted to be with his father. These findings indicate the trial court's consideration of the first two prongs of the best-interest analysis under R.C. 2151.414(D).

{¶ 19} The trial court made findings as to the child's custodial history. The child had been in the custody of FCCS for over three and one-half years at the time of the final hearing on the PCC motion. During that time, the child's mother had lost interest in seeking custody of the child. J.W. Sr. had, however, visited his son as often as permitted during that period of time and had maintained the bonding with J.W. Jr., perhaps even increased it.

{¶ 20} Some analysis of R.C. 2151.414(D)(4) can be inferred from the trial court's opinion, but the factor is particularly problematic in J.W. Jr.'s case. The child had been in two separate foster homes while he was in the custody of FCCS. Because the child had acted out in the first foster-care home, he had been transferred to a second foster-care home. The family in the second home was not expressing an interest in adopting J.W. Jr. This situation meant that upon the granting of the PCC motion, J.W. Jr. was going to have his ties to his

father cut and was going to have his ties to the second foster family cut. No one had expressed an interest in adopting the child as of the date of the final hearing.

{¶ 21} If the testimony of Ms. Dixon, J.W. Sr.'s fiancée, is to be believed, a secure permanent home was immediately available for the child and his father without the granting of PCC of the child. The trial court did not question Ms. Dixon's credibility, but discounted her resolution of the placement of the child because Ms. Dixon had had a relationship with J.W. Sr. for a period of approximately six months, and the couple had been engaged for only about two weeks as of the date of the final hearing on the PCC motion. The problem with the proof of this factor—R.C. 2151.414(D)(4)—is the primary reason that we hold that the proof of the need for the granting of PCC did not meet the standard of clear and convincing evidence required both by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and by the pertinent Ohio statute.

{¶ 22} The fifth factor required by R.C. 2151.414(D), regarding 2151.414(E)(7) to (11), involves criminal convictions, withholding of medical treatment, substantial risk of harm due to alcohol or drug abuse, abandonment of the child, and termination of parental rights with respect to siblings. None of the factors are present with respect to J.W. Sr.

{¶ 23} The Supreme Court of Ohio has indicated that a juvenile court shall consider all relevant factors in determining the best interests of a child, not just the factors enumerated in R.C. 2151.414(D). See *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816. However, none of the other factors described by the trial court strengthen the proof here to the point of proof by clear and convincing evidence.

{¶ 24} In light of our findings with respect to the proof, we sustain the father's sole assignment of error and the child's first assignment of error.

{¶ 25} In light of our ruling on these two assignments of error, we do not address either the trial court's ruling on R.C. 2151.414(B)(1)(d) or the remaining assignments of error because they become moot issues.

{¶ 26} This case presents a structural concern that was not addressed in an assignment of error but may be significant for further cases. Juv.R. 4(A) requires that an abused or allegedly abused child be represented by counsel. The precise words of Juv.R. 4(A) are:

**Assistance of counsel.** Every party shall have the right to be represented by counsel and every child, parent, custodian, or other person in loco parentis the right to appointed counsel if indigent. These rights shall arise when a person becomes a party to a juvenile court proceeding. When the complaint alleges that a child is an abused child, the court must appoint an attorney to represent

the interests of the child. This rule shall not be construed to provide for a right to appointed counsel in cases in which that right is not otherwise provided for by constitution or statute.

{¶ 27} Frequently, the juvenile courts in central Ohio have appointed attorneys to serve as guardians ad litem with the understanding that the guardian will serve to both protect the interest of a child as required by Juv.R. 4(B) and represent the interests of the child under Juv.R. 4(A). Given the mandate of Juv.R. 4(A), the better course would be for the juvenile court to expressly appoint an attorney in dual roles as a guardian ad litem and as an attorney for the child. If the attorney finds that the two roles conflict, then a separate attorney and guardian ad litem can be appointed. The roles of attorney and guardian ad litem can conflict in situations in which the child, especially an allegedly abused child, wants something that conflicts with what the guardian ad litem feels is in the child's best interests.

{¶ 28} In J.W. Jr.'s case, no separate attorney was appointed to represent the child for over one and one-half years. We cannot say that the delay impacted the outcome. We also cannot say from the record before us whether the original guardian ad litem served in both roles or viewed herself as serving in both roles. However, the record before us would be better and more in compliance with Juv.R. 4(A) if the trial court had expressly made the dual appointment to represent J.W. Jr. from the beginning of the proceedings.

{¶ 29} As indicated above, the child's first assignment of error and the father's sole assignment of error are sustained. The child's remaining assignments of error are rendered moot. The judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, is vacated, and the cause is remanded for further appropriate proceedings.

Judgment vacated
cause remanded.

BROWN, J., concurs.

SADLER, P.J., dissents.

SADLER, Presiding Judge, dissenting.

{¶ 30} Because there is clear and convincing evidence in the record supporting the trial court's judgment, I would overrule the father's assignment of error and J.W. Jr.'s first assignment of error. Accordingly, I respectfully dissent.

{¶ 31} The majority reverses the trial court's judgment on the basis that, in the majority's view, there is evidence that a legally secure permanent placement is available without granting permanent custody to FCCS. This conclusion appears

to treat R.C. 2151.414(D)(4) as a controlling factor that eclipses all others in determining a child's best interest. It is contrary to the explicit holding of the Supreme Court of Ohio that "[R.C. 2151.414] does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 64.

{¶ 32} I also disagree with the majority's determination that Sharon Dixon's testimony demonstrates that "a secure permanent home was immediately available for the child and his father without the granting of PCC of the child." R.C. 2151.414(D)(4) provides, "In determining the best interest of a child * * * the court shall consider * * * [t]he child's need for a legally *secure permanent* placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." (Emphasis added.)

{¶ 33} The Ohio Revised Code does not define the term "legally secure permanent placement." But the word "secure" means "free from fear, care, or anxiety," "affording safety," "trustworthy, dependable," "strong, stable, or firm enough to ensure safety," and "capable of being expected or counted on with confidence." Webster's Third New International Dictionary (1966) 2053. The word "permanent" means "continuing or enduring (as in the same state, status, place) without fundamental or marked change," "not subject to fluctuation or alteration," and "lasting, stable." Id. at 1683.

{¶ 34} In accord with these definitions, Ohio courts have interpreted R.C. 2151.414(D)(4) as requiring a placement that is stable and consistent.[1] The word "stable" means "firmly established" and "abiding, enduring, persisting, permanent." Id. at 2218. The word "consistent" means "marked by harmony, regularity, or steady continuity throughout." Id. at 484.

{¶ 35} The majority believes that the record contains evidence that it is possible to achieve a placement for J.W. Jr. that is legally secure—in other words, trustworthy, dependable, stable, and capable of being counted on with confidence; as well as permanent—in other words, continuing without fundamental or marked change, lasting, harmonious, and marked by continuity. The majority bases this belief upon the testimony of Sharon Dixon.

---

1. See, e.g., *In re D.P.*, 10th Dist. No. 06AP–780, 2007-Ohio-1703, 2007 WL 1080657, ¶ 16; *In re Collins* (Aug. 24, 2000), 10th Dist. No. 99AP–1468, 2000 WL 1199223; *In re P.B.*, 9th Dist. No. 23276, 2006-Ohio-5419, 2006 WL 2959520, ¶ 32; *In re McCain*, 4th Dist. No. 06CA654, 2007-Ohio-1429, 2007 WL 914870, ¶ 20, citing *In re Adoption of Ridenour* (1991), 61 Ohio St.3d 319, 324, 574 N.E.2d 1055; *In re Janson*, 11th Dist. No. 2005–G–2657, 2005-Ohio-6713, 2005 WL 3476624, ¶ 67–68; *In re T.M. III*, 8th Dist. No. 83933, 2004-Ohio-5222, 2004 WL 2340654, ¶ 59, *In re P.P.*, 2nd Dist. No. 19582, 2003-Ohio-1051, 2003 WL 863568, ¶ 30; *In re Miqueal M.*, 6th Dist. No. L–02–1020, 2002-Ohio-3417, 2002 WL 1438664, ¶ 30.

{¶ 36} Upon close evaluation of the facts of record, however, I find no support for the majority's conclusion.  Dixon testified that she became acquainted with J.W. Sr. through the Internet and first began conversing with him in March 2006. She first met him in person in June 2006, just two months prior to the hearing on the PCC motion.  By the date of the hearing, Dixon had spent merely 13 days with J.W. Sr. in person.  Yet two weeks before the hearing, the couple became engaged.

{¶ 37} As of the date of the hearing, however, they had made no specific plans to marry, and J.W. Sr. had never traveled to Oklahoma to visit her.  He and Dixon stated that they planned for J.W. Sr. to move to Oklahoma, but did not say when.  J.W. Sr. told the court that he had never informed J.W. Jr.'s caseworker about Dixon's existence or his relationship to her.  It was Dixon who called the caseworker late in the week immediately preceding the trial.

{¶ 38} Dixon is retired and lives in Henryetta, Oklahoma, with her 92–year–old mother and her 30–year–old son.  That son has a criminal record and is on probation.  He had a drug addiction, and it had been one year, she said, since he had used drugs.  Dixon stated that the couple planned for J.W. Sr. to move to Oklahoma to live in Dixon's home, which is a duplex that she owns.  Each side of the duplex has three bedrooms.  She lives in one side with her mother and son, and she planned for J.W. Sr. and J.W. Jr. (should he be returned to his father's custody) to move into the other side of the duplex upon completion of repairs to that side occasioned by damage done by former tenants.  She did not say when those repairs would be completed but stated that the damage was extensive because the tenants had punched holes in the walls and had set the home on fire. She stated that once she and J.W. Sr. marry, she will move into the other side of the duplex with him and J.W. Jr.

{¶ 39} J.W. Sr. testified that he lives with his parents and that their home is unfit for a child.  He further stated that his only source of income is the $50 to $100 per week that he earns selling scrap metal and "junk" that he collects, and he admitted that his income is insufficient to support J.W. Jr.  He admitted that his employment and housing situations have not changed in the four years in which J.W. Jr. has been in foster care, despite the fact that J.W. Sr.'s case plan required him to obtain and maintain adequate and stable housing and employment.  When J.W. Sr. was asked what he would do if J.W. Jr. were returned to him, he stated that he would take J.W., Jr. to Oklahoma.  However, J.W. Sr. admitted that he does not know Dixon very well.  Dixon has never met J.W. Jr.

{¶ 40} In light of J.W. Sr.'s employment situation, Dixon was asked about the employment prospects in Henryetta.  She replied, "There's—there's some employment.  I mean, it's not—like my son, when he was working, right now he's working for construction and he's working there, and I think he could probably

get [J.W. Sr.] on, I'm not sure." She later testified, however, that, "Henryetta, it's more of a retirement community" so there is "not much" construction activity going on in the town.

{¶ 41} Then, Dixon was asked whether she would be able to support J.W. Sr. and J.W. Jr. in the event that J.W. Sr. was unable to obtain employment right away or even for a long time. She replied, "Well, I get my social security; it's not a lot but * * *." She later testified that she receives $900 to $950 per month in Social Security.

{¶ 42} When asked if Dixon has any income other than her own Social Security, she told the court, "[M]y mom lives with me so, I mean, right now she pays all the—she buys all the groceries, so I've got more than enough to live on right now. But if anything happened to her I—I would have to cut corners a little bit maybe." She added that her other son (who does not live with her) works at a pizza shop, saying, "I think maybe I could probably get him to hire [J.W. Sr.] too, but that wouldn't be the kind of job [J.W. Sr.] really want and needs, you know."

{¶ 43} Under R.C. 2151.414(D)(4), the trial court was not charged with merely determining whether J.W. Sr. represented a *loving* placement, which J.W. Sr. may very well be, given his bonded relationship with his son that has developed through regular visitation. Rather, the court was obligated to consider J.W. Jr.'s need for a *legally secure permanent* placement, and whether, on the record before it, that type of placement can be achieved without a grant of permanent custody to the agency. *In re P.B.*, 9th Dist. No. 23276, 2006-Ohio-5419, 2006 WL 2959520, ¶ 39. A placement dependent upon nothing more than inchoate hopes and dreams of relocation, marriage, and employment is inadequate to fulfill the need for a legally secure permanent placement.

{¶ 44} Moreover, "[p]ermanent placement of a child outside the home is not an abuse of discretion where a parent has historically been unable to comply with a case plan for a period of years, and then comes into court with 'clean hands' for a period of a few weeks." *In re Collins* (Aug. 24, 2000), 10th Dist. No. 99AP–1468, 2000 WL 1199223, quoting *In re Maye* (May 4, 2000), 10th Dist. No. 99AP–529, 2000 WL 552194 (judgment granting permanent custody to agency affirmed when mother had had three years in which to complete her case plan, despite the fact that mother had recently obtained full-time employment, because, inter alia, she depended on her cousin for housing, she did "not seem to grasp the importance of providing a secure, stable environment for [her child]" and she admitted that she had no real plans as to how she would support herself or her child).

{¶ 45} Indeed, *Maye* stated, " '[a parent's] eleventh-hour efforts to convince the court that [he] should be awarded custody are not sufficient to indicate that [he] is capable of * * * caring for a child.' " Id. at *23, quoting *In re Gallatin* (Apr. 16, 1997), 6th Dist. No. 96CA0059, 1997 WL 193683.

{¶ 46} Here, J.W. Sr.'s "eleventh-hour" engagement to a woman with whom he has spent only 13 days does not give J.W. Sr. "clean hands" and is insufficient to demonstrate that J.W. Jr.'s need for a legally secure permanent placement can be met other than by granting the agency's motion for PCC. It is undisputed that J.W. Sr. has for *four years* accomplished no change whatsoever in his dismal financial and housing situations, both of which were requirements of his case plan. Simply stated, J.W. Sr. has no means of supporting J.W. Jr. and has no prospect of being able to do so, on his own, in the future.

{¶ 47} But the majority sees Dixon as the remedy for all of these deficiencies and views her as a legitimate means of achieving a legally secure permanent placement for J.W. Jr., despite the fact that she and J.W. Sr. had been engaged for only two weeks, she had never met J.W. Jr., and no one who testified (except Dixon) had ever even been to her home. Indeed, J.W. Sr. admitted that he really did not know Dixon very well.

{¶ 48} Even if the two had had a more established relationship and definitive marriage plans, Dixon barely receives sufficient income to support herself and her son, and she maintains the household only with the help of her 92–year–old mother's Social Security checks. She admits that she would experience financial difficulties if her mother were to pass away. She testified to limited employment opportunities in her hometown and stated that one of her sons could "maybe" or "probably" get J.W. Sr. a job.

{¶ 49} On this evidence, the trial court stated:

There appears to be no persuasive reason why the father should be excused from establishing an adequate home for the child in the past 46 months. He has no statutory disability for excusing him from providing an adequate home. Other parents with more limited capabilities regularly secure adequate housing.

Foster care has been too convenient for the father to be motivated to secure housing. *The potential with the new relationship with Ms. Dixon is too speculative and too recent.*

(Emphasis added.)

{¶ 50} Indeed, this court has affirmed a grant of permanent custody to the agency when the possibility of placement with the parent is "speculative" at the time of trial, even when the parent had recently made progress following repeated failures to complete aspects of the case plan. *In re Dailey,* 10th Dist. No. 04AP–1346, 2005-Ohio-2196, 2005 WL 1055783, ¶ 20.

{¶ 51} Because there is no evidence that a legally secure permanent placement can be achieved without a grant of permanent custody to the agency, and because there is clear and convincing evidence supporting the trial court's determination

that a legally secure permanent placement *cannot* be achieved without granting FCCS's motion for permanent custody, this factor weighs heavily in favor of granting that motion.

{¶ 52} As for the other factors required to be considered under R.C. 2151.414(D), the first factor weighs equally in favor of granting and denying the motion because, as the majority noted, J.W. Jr. is bonded with this father and with his foster family. The second factor weighs against granting the motion because J.W. Jr. has expressed his desire to be with his father. The third factor weighs in favor of granting the motion because J.W. Jr. had been in the custody of FCCS for over three and one-half years (virtually half his life) at the time of trial. The trial court also found that the GAL's recommendation is a relevant factor and noted that the GAL recommended that the motion be granted.

{¶ 53} In light of all of the foregoing, the trial court's judgment granting permanent custody of J.W. Jr. to FCCS is supported by competent, credible, clear, and convincing evidence and, therefore, must be affirmed. *In re L.M.,* 10th Dist. No. 06AP–534, 2007-Ohio-1596, 2007 WL 1018390, ¶ 7; *In re J.J.,* 10th Dist. No. 06AP–495, 2006-Ohio-6151, 2006 WL 3375090, ¶ 7, discretionary appeal not allowed, 112 Ohio St.3d 1495, 2007-Ohio-724, 862 N.E.2d 120.

{¶ 54} I disagree with the majority's analysis and disposition of the father's assignment of error and J.W. Jr.'s first assignment of error, and I would overrule these assignments of error. Finding no merit in J.W. Jr.'s second and third assignments of error, I would affirm the judgment of the trial court. For all of the reasons set forth herein, I dissent.