[Cite as *In re M.M.*, 2021-Ohio-2287.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
PIKE COUNTY

In the Matter of: : 
                        :     Case No. 20CA907

M.M. : 
                        :
                        :
                        :     <u>DECISION AND JUDGMENT</u>
                        :     <u>ENTRY</u>
                        :
                        :     **RELEASED: 06/28/2021**
                        :

_____

<u>APPEARANCES:</u>

Karyn Justice, Portsmouth, Ohio, for Appellant.

Lauren E. Coriell, Waverly, Ohio, for Appellee.

Matthew P. Brady, Grove City, Ohio, Guardian Ad Litem.

_____

Wilkin, J.

{¶1} Appellant, J.M., appeals the Pike County Court of Common Pleas, Juvenile Division's, judgment that granted Pike County Children Services Board ("the agency") permanent custody of her now seven-year-old biological child, M.M. In her sole assignment of error, appellant asserts that the trial court's decision is against the manifest weight and sufficiency of the evidence. We do not agree with appellant's argument. The record contains ample, clear and convincing evidence to support the trial court's decision to grant the agency permanent custody of M.M. Therefore, we affirm the trial court's judgment.

FACTS AND PROCEDURAL BACKGROUND

{¶2} In March 2018, the agency received a report that appellant had been abusing illegal drugs and this caused concern for the welfare of her then four-year-old child, M.M.  The agency's caseworker, Bobbie Jo Dietzel, went to appellant's home to investigate.  Dietzel spoke with appellant regarding the agency's concerns, and appellant submitted to a drug screen.  Appellant tested positive for methamphetamines, cocaine, amphetamines, and marijuana.

{¶3} Dietzel asked appellant whether any relatives were available to care for M.M.  Appellant identified her adult daughter, P.L., as a placement.  However, P.L. was ill at the time and unable to take care of M.M.

{¶4} The agency subsequently obtained emergency custody of M.M., and filed a complaint alleging that M.M. was an abused, neglected and dependent child.  The agency further requested temporary custody of M.M.

{¶5} On June 14, 2018, the trial court adjudicated M.M. a neglected and dependent child and dismissed the abuse allegation.  Shortly thereafter, the trial court entered a dispositional order that placed M.M. in the agency's temporary custody.

{¶6} The agency developed a case plan for the family with the goal to reunify M.M. with appellant.  The case plan required appellant to maintain stable housing, to ensure that the child's basic needs are met, to undergo inpatient substance abuse treatment and to follow treatment recommendations, and to take domestic violence and parenting classes.

{¶7} Over the course of a year and one-half, appellant maintained stable housing, consistently visited with the child, and completed domestic violence and parenting classes. However, despite numerous attempts, appellant was unable to successfully complete a substance abuse treatment program and she failed to maintain clean drug screens.

{¶8} Thus, on December 5, 2019, the agency filed a motion to modify the disposition from temporary custody to permanent custody. The agency alleged that M.M. has been in its temporary custody for 12 or more months of a consecutive 22-month period and that placing M.M. in its permanent custody is in the child's best interest.

{¶9} On June 4, 2020, the trial court held a hearing to consider the agency's request for permanent custody. Caseworker Dietzel testified that she was unable to find a relative to care for M.M., so the child remained in the temporary custody of the agency since the initial removal. Dietzel explained that appellant has maintained housing and completed domestic violence and parenting classes, but appellant has not successfully conquered her substance abuse issues and continued to test positive for illegal substances into the year 2020.

{¶10} Dietzel testified that M.M. currently lives in a foster home and has been in this home since August 2019. Dietzel indicated that M.M. appears "very bonded" with the foster parent and seems happy. Dietzel stated that M.M. had been in a previous foster home but had displayed aggressive behaviors such as pushing another child into the road and choking some of the other children.

Dietzel explained that since M.M. entered the new foster home, her aggressive behaviors have stopped and Dietzel has noticed a "huge difference" in M.M.'s behaviors.

{¶11} The permanent custody hearing was continued until September 2020. In the interim, appellant filed a motion requesting the trial court to place M.M. in the legal custody of the child's older sister, P.L.

{¶12} When the hearing resumed in September 2020, Dietzel explained that since the last hearing in June 2020, appellant has refused to submit to drug tests and had revoked the release of information from treatment providers. As a result, Dietzel was unable to ascertain the status of appellant's substance abuse treatment.

{¶13} Dietzel testified that M.M. has remained in the same foster home since the date of the last hearing and that she is "very well adjusted" and seems "very bonded with everyone in that home." Dietzel indicated that M.M.'s behavior can be "kind of rough" the day after visiting with appellant. Dietzel stated that M.M. sometimes is "very aggressive towards the other kids."

{¶14} Dietzel related that during a July 2020 visit, Dietzel heard appellant tell M.M. that she would "have to go to [P.L.'s] for awhile while Mommy's [sic] finishes school. And then you will come back to me." Dietzel stated that she advised appellant that said statement was "very concerning."

{¶15} The foster parent testified that M.M.'s behavior has significantly improved since the date the child first entered her home. The foster parent stated that M.M. initially had "bonding issues," "[t]rust issues," and "was

completely out of control."  The foster parent explained that over the past year,

M.M. has tried a few different medications to help with her behaviors and she has

received counseling.  The foster parent indicated that both treatments seemed to

help improve M.M.'s behaviors.  The foster parent further testified that once the

pandemic restrictions brought an end to M.M.'s in-person visits with appellant,

M.M. was able to stop taking medication and "her behavior was immaculate."

{¶16} The foster parent stated that she intends to adopt M.M. if the trial

court grants the agency permanent custody of the child.  The foster parent

testified that M.M. is "very bonded" and "pretty much inseparable" from the foster

parent's eight-year-old daughter.

{¶17} P.L. testified that she believes placing M.M. in her legal custody

would be in the child's best interest.  P.L. explained that although she and M.M.

are siblings, the 16-year age gap between them has led her to think of M.M. "kind

of like [a] daughter."  P.L. stated that she was part of M.M.'s everyday life until

she moved out of appellant's apartment and into another apartment in the same

complex.  P.L. related that even after she moved into her own apartment, she still

saw M.M. "almost every single day."

{¶18} P.L. stated that after the agency obtained temporary custody of

M.M., she attended visits with appellant until the pandemic restrictions no longer

allowed appellant to visit.  P.L. explained that during an overnight weekend visit

in April 2019, she cut the visit short for a variety of reasons.  P.L. indicated that at

the time, M.M. had not been taking medication for her behavioral issues and P.L.

was five or six months pregnant.  She stated that M.M.'s "behavior was

overwhelming [her]" and "causing a lot of stress." P.L. further explained that at the time, she was living in a two-bedroom apartment and was concerned the apartment would not be large enough for her growing family and M.M. P.L. testified that she wanted to obtain legal custody of M.M., but she also was struggling with the decision due to M.M.'s behavioral issues.

{¶19} P.L. stated that she now lives in a three-bedroom apartment with her husband and their two young children. She explained that M.M. would have her own bedroom and that her younger children would share a room.

{¶20} P.L. recognized the agency's concern that placing M.M. in her apartment, the same apartment complex as appellant, would create problems. P.L. stated she would be willing to move and that moving is part of her long-term plan. She also explained that she would protect M.M. from appellant, if appellant continues to use illegal drugs.

{¶21} On cross-examination, P.L. agreed that in December of 2019, when the agency filed its permanent custody motion, she was unable to take custody of M.M. P.L. further agreed that living in the same apartment complex as appellant "would be difficult" but stated that she is willing to move and that appellant also is willing to move.

{¶22} The guardian ad litem (GAL) testified he believes placing M.M. in the agency's permanent custody is in the child's best interest. He explained that he has concerns about placing M.M. in P.L.'s legal custody due to the potential contact that may occur between appellant and the child. The GAL indicated that contact with appellant "would be traumatic for the minor child." He further stated

that he has concerns about the financial stability of P.L.'s home.  The GAL explained he learned during P.L.'s testimony that she and her husband had some marital troubles and that her husband has only been living with her for about three to four months.

{¶23} The court asked the GAL his opinion about M.M. having contact with appellant.  The GAL stated that it would "be pretty rough."  He indicated that when talking with M.M., the child's "wishes are inconsistent about what she ultimately wants.  But she does not want to be with her mother."  The GAL thought that "forcing visits at this time would be traumatic."

{¶24} On October 22, 2020, the trial court granted the agency permanent custody of M.M.  The court found that M.M. has been in the agency's temporary custody for more than 12 of the past 22 consecutive months and granting the agency permanent custody is in the child's best interest.  The court noted that appellant failed to complete a drug treatment program and she continues to abuse illegal substances.   The court further observed that M.M. "shares a very strong bond with her foster family" and the foster family will seek to adopt the child.  The court found that M.M. is too young to express her wishes but noted that the GAL recommended granting the agency permanent custody.  The court additionally determined that M.M. needs a legally secure permanent placement and the child cannot achieve this type of placement without granting the agency permanent custody.

{¶25} The trial court denied appellant's motion to place M.M. in P.L.'s legal custody.  The court did not believe that P.L. could provide the child with a legally

secure permanent placement.  The court further expressed concern whether P.L. would adequately protect the child from appellant's substance abuse.  The court observed that Dietzel testified that she heard appellant tell M.M. that she would be staying with P.L. for a while and then would be back home with appellant.  The court additionally noted that "P.L. allowed M.M. to languish in foster care for nearly two (2) years before she was willing to be considered for placement."

**{¶26}** The court thus terminated appellant's parental rights and granted the agency permanent custody of M.M.  This appeal followed.

ASSIGNMENT OF ERROR

THE TRIAL COURT'S AWARD OF PERMANENT CUSTODY OF M.M. TO THE PIKE COUNTY CHILDREN SERVICES BOARD (PCCSB) WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

**{¶27}** In her sole assignment of error, appellant argues that the trial court's decision to grant the agency permanent custody of M.M. is against the manifest weight of the evidence.  Appellant contends that the evidence fails to clearly and convincingly show that terminating her parental rights is in M.M.'s best interest.  Appellant asserts that the trial court failed to appropriately consider the strong familial bonds that M.M. shares with appellant and P.L.

**{¶28}** Appellant also challenges the trial court's finding that M.M. cannot achieve a legally secure permanent placement without granting the agency permanent custody.  Appellant candidly agrees that she presently is unable to be M.M.'s legal custodian.  She instead claims the trial court should have placed the child with P.L. rather than terminate appellant's parental rights.  Appellant argues

that P.L. could provide the child with a legally secure permanent placement and terminating appellant's parental rights was unnecessary.

**{¶29}** Appellant additionally asserts that the trial court's decision to deny her motion to place M.M. in P.L.'s custody is against the manifest weight of the evidence.

STANDARD OF REVIEW

**{¶30}** Generally, a reviewing court will not disturb a trial court's permanent custody decision unless the decision is against the manifest weight of the evidence. *E.g., In re B.E.*, 4th Dist. Highland No. 13CA26, 2014-Ohio-3178. 2014 WL 3557277, ¶ 27; *In re R.S.*, 4th Dist. Highland No. 13CA22, 2013-Ohio-5569, 2013 WL 6710797, ¶ 29.

> "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' "

*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting Black's Law Dictionary 1594 (6th Ed.1990).

**{¶31}** When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court " ' "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of

justice that the [judgment] must be reversed and a new trial ordered." ' "

*Eastley* at ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115, 750

N.E.2d 176 (9th Dist. 2001), quoting *Thompkins*, 78 Ohio St.3d at 387,

quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.

1983); *accord In re Pittman*, 9th Dist. Summit No. 20894, 2002-Ohio-2208, 2002

WL 987852, ¶¶ 23-24.  We further observe, however, that issues relating to the

credibility of witnesses and the weight to be given the evidence are primarily for

the trier of fact.  As the court explained in *Seasons Coal Co. v. Cleveland*, 10

Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984):

> The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.

Moreover, deferring to the trial court on matters of credibility is "crucial in a child

custody case, where there may be much evident in the parties' demeanor and

attitude that does not translate to the record well."  *Davis v. Flickinger*, 77 Ohio

St.3d 415, 419, 674 N.E.2d 1159 (1997); *accord In re Christian*, 4th Dist. No.

04CA 10, 2004-Ohio-3146, 2004 WL 1367999, ¶ 7.

{¶32} The question that an appellate court must resolve when reviewing a

permanent custody decision under the manifest weight of the evidence standard

is "whether the juvenile court's findings * * * were supported by clear and

convincing evidence."  *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895

N.E.2d 809, ¶ 43; *accord In re A.M.*, --- Ohio St.3d ---, 2020-Ohio-5102, ---

N.E.3d ---, ¶ 19; *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308,

¶ 26.

"Clear and convincing evidence" is:

the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.

*In re Estate of Haynes*, 25 Ohio St.3d 101, 103-04, 495 N.E.2d 23 (1986).

{¶33} In determining whether a trial court based its decision upon clear

and convincing evidence, "a reviewing court will examine the record to determine

whether the trier of facts had sufficient evidence before it to satisfy the requisite

degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54

(1990); *accord In re Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985),

citing *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954) ("Once the

clear and convincing standard has been met to the satisfaction of the [trial] court,

the reviewing court must examine the record and determine if the trier of fact had

sufficient evidence before it to satisfy this burden of proof."); *In re Adoption of*

*Lay*, 25 Ohio St.3d 41, 42-43, 495 N.E.2d 9 (1986). *Cf. In re Adoption of Masa*,

23 Ohio St.3d 163, 165, 492 N.E.2d 140 (1986) (stating that whether a fact has

been "proven by clear and convincing evidence in a particular case is a

determination for the [trial] court and will not be disturbed on appeal unless such

determination is against the manifest weight of the evidence").

{¶34} Thus, if a children services agency presented competent and

credible evidence upon which the trier of fact reasonably could have formed a

firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence. *In re R.M.*, 997 N.E.2d 169, 2013-Ohio-3588 (4th Dist.), ¶ 62; *In re R.L.*, 2nd Dist. Greene Nos. 2012CA32 and 2012CA33, 2012-Ohio-6049, 2012 WL 6674527, ¶ 17, quoting *In re A.U.*, 2nd Dist. Montgomery No. 22287, 2008-Ohio-187, 2008 WL 185494, ¶ 9 ("A reviewing court will not overturn a court's grant of permanent custody to the state as being contrary to the manifest weight of the evidence 'if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements * * * have been established.' ").

{¶35} Once a reviewing court finishes its examination, the judgment may be reversed only if it appears that the fact-finder, when resolving the conflicts in evidence, " 'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the " 'exceptional case in which the evidence weighs heavily against the [decision].' " *Id.*, quoting *Martin*, 20 Ohio App.3d at 175; *accord State v. Lindsey*, 87 Ohio St.3d 479, 483, 721 N.E.2d 995 (2000).

FUNDAMENTAL NATURE OF PARENTAL RIGHTS

{¶36} We recognize that "parents' interest in the care, custody, and control of their children 'is perhaps the oldest of the fundamental liberty interests recognized by th[e United States Supreme] Court.' " *In re B.C.*, 141 Ohio St.3d

55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 19, quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Indeed, the right to raise one's "child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990); *accord In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997); *see Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (stating that "natural parents have a fundamental right to the care and custody of their children"). Thus, "parents who are 'suitable' have a 'paramount' right to the custody of their children." *B.C.* at ¶ 19, quoting *In re Perales*, 52 Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977), citing *Clark v. Bayer*, 32 Ohio St. 299, 310 (1877); *Murray*, 52 Ohio St.3d at 157.

**{¶37}** A parent's rights, however, are not absolute. *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶ 11. Rather, " 'it is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.' " *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla. App. 1974). Thus, the state may terminate parental rights and grant permanent custody to a children services agency when a child's best interest demands it. *D.A.* at ¶ 11.

PERMANENT CUSTODY PROCEDURE

**{¶38}** Before a court may award a children services agency permanent custody of a child, R.C. 2151.414(A)(1) requires the court to hold a hearing. The primary purpose of the hearing is to allow the court to determine whether the child's best interests would be served by permanently terminating the parental

relationship and by awarding permanent custody to the agency. *Id.* Additionally, when considering whether to grant a children services agency permanent custody, a trial court should consider the underlying purposes of R.C. Chapter 2151: "to care for and protect children, 'whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety.' " *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 29, 862 N.E.2d 816, quoting R.C. 2151.01(A).

**{¶39}** A children services agency may obtain permanent custody of a child by (1) requesting it in an abuse, neglect or dependency complaint under R.C. 2151.353, or (2) filing a motion under R.C. 2151.413 after obtaining temporary custody. In this case, the agency sought permanent custody of the child by filing a motion under R.C. 2151.413. When an agency files a permanent custody motion under R.C. 2151.413, R.C. 2151.414 applies. R.C. 2151.414(A).

**{¶40}** R.C. 2151.414(B)(1) permits a trial court to grant permanent custody of a child to a children services agency if the court determines, by clear and convincing evidence, that the child's best interest would be served by the award of permanent custody and that one of the following conditions applies:

> (a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
> (b) The child is abandoned.
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for

twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

**{¶41}** Thus, before a trial court may award a children services agency permanent custody, it must find, by clear and convincing evidence, (1) that one of the circumstances described in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) that awarding the children services agency permanent custody would further the child's best interest.

## A. R.C. 2151.414(B)(1)(d)

**{¶42}** In the case at bar, the trial court found that the child has been in the agency's temporary custody for 12 or more months of a consecutive 22-month period and, therefore, that R.C. 2151.414(B)(1)(d) applies.  Appellant does not dispute the trial court's R.C. 2151.414(B)(1)(d) finding, so we do not address it.

## B. BEST INTEREST

**{¶43}** R.C. 2151.414(D) directs a trial court to consider "all relevant factors," as well as specific factors, to determine whether a child's best interest will be served by granting a children services agency permanent custody.  The listed factors include: (1) the child's interaction and interrelationship with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes, as expressed directly by the child or through the child's GAL, with due regard for the child's maturity; (3) the child's custodial history; (4) the child's need for a legally secure permanent placement and whether that type of placement can be

achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.[1]

**{¶44}** Deciding whether a grant of permanent custody to a children services agency will promote a child's best interest involves a delicate balancing of "all relevant [best interest] factors," as well as the "five enumerated statutory factors." *C.F.* at ¶ 57, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56; *accord In re C.G.*, 9th Dist. Summit Nos. 24097 and 24099, 2008-Ohio-3773, 2008 WL 2906526, ¶ 28; *In re N.W.*, 10th Dist. Franklin Nos. 07AP-590 and 07AP-591, 2008-Ohio-297, 2008 WL 224356, ¶ 19. However, none of the best interest factors requires a court to give it "greater weight or heightened significance." *C.F.* at ¶ 57. Instead, the trial court considers the totality of the circumstances when making its best interest determination. *In re K.M.S.*, 3rd Dist. Marion Nos. 9-15-37, 9-15-38, and 9-15-39, 2017-Ohio-142, 2017 WL 168864, ¶ 24; *In re A.C.*, 9th Dist. Summit No. 27328, 2014-Ohio-4918, ¶ 46. In general, "[a] child's best interest is served by placing the child in a permanent situation that fosters growth, stability, and security." *In re C.B.C.*, 4th Dist. Lawrence Nos. 15CA18 and 15CA19, 2016-Ohio-916, 2016 WL 915012, ¶ 66, citing *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 324, 574 N.E.2d 1055 (1991).

---

[1] The factors listed under R.C. 2151.414(E)(7) through (11) require courts to consider the following: (1) whether a parent has been convicted of or pleaded guilty to specific criminal offenses against the child, the child's sibling or another child who lived in the parent's household; (2) whether a parent withheld medical treatment or food from the child; (3) whether a parent repeatedly placed the child at substantial risk of harm because of alcohol or drug abuse; (4) whether a parent abandoned the child; and (5) whether a parent's parental rights as to a sibling of the child have been involuntarily terminated.

**{¶45}** In the case at bar, we believe that the record contains ample, clear and convincing evidence to support the trial court's decision that placing M.M. in the agency's permanent custody is in the child's best interest. The record fails to support a finding that the trial court committed a manifest miscarriage of justice. Therefore, the trial court's judgment is not against the manifest weight of the evidence.

### 1. Child's Interactions and Interrelationships

**{¶46}** The testimony presented during the permanent custody hearing shows that appellant dearly loves M.M., and that she shared a close bond with the child. Appellant consistently visited M.M., and the agency did not express concerns about her interaction with the child.

**{¶47}** However, appellant's drug use interfered and continues to interfere with her ability to be a consistent presence in the young child's life. We commend appellant for recognizing her addiction and for agreeing that she is unable to take custody of M.M. while her substance abuse issues persist. Nonetheless, appellant's decision to elevate her drug use over parenting M.M. has placed the child's well-being at risk. The evidence shows that M.M. displayed aggressive behaviors and eventually was placed on medication to control her hyperactivity. The GAL stated that M.M. would experience trauma if forced to visit appellant. Thus, even if the surface interactions between appellant and M.M. appeared appropriate, the deeper levels of the interrelationship suggest that a continuing relationship would be detrimental to the child's well-being.

{¶48} P.L. and her family also share a relationship with M.M. The evidence shows that P.L. cares for M.M. and would like to take custody of the child. However, P.L. did not file a motion for custody of M.M. Instead, appellant filed a motion that asked the court to place M.M. with P.L. Additionally, when M.M. was scheduled for a two-day weekend visit with P.L., P.L. called the foster parent within the first day of the visit and asked the foster parent to pick up M.M. a day sooner than scheduled. The trial court and the agency also expressed concern whether P.L. would be able or willing to adequately protect the child from appellant.

{¶49} M.M. has bonded with the foster family. M.M. appears especially bonded to the foster parent's eight-year-old daughter. The foster parent described the two as "inseparable."

{¶50} To the extent appellant asserts that the trial court was required to explicitly discuss each of M.M.'s interactions and interrelationships in its decision, the Ohio Supreme Court has rejected the notion that a trial court must comment on each individual best-interest factor in its decision. *In re A.M.*, 2020-Ohio-5102, ¶ 31. Instead, the *A.M.* court stated that the record simply must show that the trial court indeed considered (i.e., reflected upon or thought about with a degree of care or caution) each factor. *Id.* at ¶ 25 and ¶ 31.

{¶51} Here, the record shows that the trial court considered M.M.'s interactions and interrelationships, including M.M.'s interactions and interrelationships with appellant and P.L. Simply because the trial court did not

explicitly discuss those interactions and interrelationships in its written decision does not mean that the court failed to consider them.

### 2. Child's Wishes

{¶52} The trial court determined that M.M. is too young to directly express her wishes. The court noted that the GAL recommended that the court grant the agency permanent custody of M.M.

### 3. Custodial History

{¶53} M.M. lived with appellant for the first four years of her life. In March 2018, the agency obtained temporary custody of M.M., and the child has remained in its custody since that time.

{¶54} Following M.M.'s March 2018 removal, the agency placed her in a foster home. The agency eventually moved M.M. to a second foster home, where she has since remained.

### 4. Legally Secure Permanent Placement

{¶55} "Although the Ohio Revised Code does not define the term, 'legally secure permanent placement,' this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, 2016 WL 818754, ¶ 56, citing *In re Dyal*, 4th Dist. Hocking No. 01CA12, 2001 WL 925423, *9 (Aug. 9, 2001) (implying that "legally secure permanent placement" means a "stable, safe, and nurturing environment"); *see also In re K.M.*, 10th Dist. Franklin Nos. 15AP-64 and 15AP-66, 2015-Ohio-4682, 2015 WL 7079930, ¶ 28 (observing that legally secure permanent placement requires more than

stable home and income but also requires environment that will provide for child's needs); *In re J.H.*, 11th Dist. Lake No. 2012-L-126, 2013-Ohio-1293, 2013 WL 1294646, ¶ 95 (stating that mother unable to provide legally secure permanent placement when she lacked physical and emotional stability and that father unable to do so when he lacked grasp of parenting concepts); *In re J.W.*, 171 Ohio App.3d 248, 2007-Ohio-2007, 870 N.E.2d 245, ¶ 34 (10th Dist.) (Sadler, J., dissenting) (stating that a legally secure permanent placement means "a placement that is stable and consistent"); Black's Law Dictionary 1354 (6th Ed. 1990) (defining "secure" to mean, in part, "not exposed to danger; safe; so strong, stable or firm as to insure safety"); *id.* at 1139 (defining "permanent" to mean, in part, "[c]ontinuing or enduring in the same state, status, place, or the like without fundamental or marked change, not subject to fluctuation, or alteration, fixed or intended to be fixed; lasting; abiding; stable; not temporary or transient").  Thus, "[a] legally secure permanent placement is more than a house with four walls.  Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs."  *M.B.* at ¶ 56.

{¶56} Moreover, a trial court that is evaluating a child's need for a legally secure permanent placement, and whether the child can achieve that type of placement, need not determine that terminating parental rights is "not only a necessary option, but also the only option."  *Schaefer* at ¶ 64.  Rather, once a court finds the existence of any one of the R.C. 2151.414(B)(1)(a)-(e) factors, R.C. 2151.414(D)(1) requires the court to weigh "all the relevant factors *

* * to find the best option for the child." *Id.* "The statute does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor. The statute does not even require the court to weigh that factor more heavily than other factors." *Id.* Instead, a child's best interest is served by placing the child in a permanent situation that fosters growth, stability, and security. *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 324, 574 N.E.2d 1055 (1991). Thus, courts are not required to favor relative placement if, after considering all the factors, it is in the child's best interest for the agency to be granted permanent custody. *Schaefer* at ¶ 64; *accord In re T.G.*, 4th Dist. Athens No. 15CA24, 2015-Ohio-5330, 2015 WL 9303036, ¶ 24; *In re V.C.*, 8th Dist. Cuyahoga No. 102903, 2015-Ohio-4991, 2015 WL 7777606, ¶ 61 (stating that relative's positive relationship with child and willingness to provide an appropriate home did not trump child's best interest).

{¶57} In the instant case, clear and convincing evidence supports the trial court's finding that M.M. needs a legally secure permanent placement that cannot be achieved without granting the agency permanent custody of the child. Appellant agrees that she cannot provide M.M. with a legally secure permanent placement. Although appellant contends that P.L., the child's older sibling, can provide the child with a legally secure permanent placement, the trial court was not obligated to favor this relative placement if granting the agency permanent custody would serve the child's best interest.

{¶58} Additionally, the trial court noted its concerns about placing M.M. with P.L. The court expressed some doubt whether P.L. would be willing to keep

the child away from appellant, if appellant continued to abuse drugs. The evidence also shows that P.L. lives near appellant and the GAL expressed concern that M.M. would experience trauma if exposed to appellant. While P.L. stated both she and appellant had discussed that the other could move to avoid inadvertent contact between appellant and M.M., as of the date of the permanent custody hearing, neither had taken any steps to move.

{¶59} We cannot fault the trial court for deciding not to experiment with M.M.'s welfare by placing her in P.L.'s legal custody with the potential for continued exposure to appellant. The trial court could have determined that the possibility that M.M. would continue to be exposed to appellant if it granted P.L. legal custody would be detrimental to the child's growth, stability, and security.

{¶60} On the other hand, the evidence shows that M.M. is doing well in her current foster home and is not at risk of being exposed to any negative influences. The foster home provides M.M. with the stability and security that will help nurture her continued growth. Moreover, the foster parent plans to adopt M.M. if the court grants the agency permanent custody of the child.

{¶61} In the end, this case is yet another sad tale of a parent's inability to conquer her substance abuse addiction despite being a loving parent. The evidence shows that appellant undoubtedly loves her child—so much so that she recognizes her inability to care for the child at the present time. While preserving the parent-child bond obviously is preferable and ordinarily in a child's best interest, circumstances may exist, as they do here, that counsel against

preserving the parent-child bond and in favor of safeguarding the child's best interest.

**{¶62}** Additionally, the facts in the case at bar gave the trial court reason to suspect that granting legal custody of M.M. to P.L. would not serve the child's best interest over the long-term. The court noted its concerns that P.L. would not take adequate steps to keep M.M. away from appellant. And the agency caseworker, Dietzel, voiced her concern that P.L. would allow M.M. to visit appellant or that allowing the child to live with P.L. would create potential for M.M. to be exposed to appellant's lifestyle of illegal substance abuse. Thus, after considering the totality of the circumstances, we are unable to agree with appellant that the trial court's decision to place M.M. in the agency's permanent custody is against the manifest weight of the evidence.

**{¶63}** For these same reasons, we do not believe that the trial court's decision to deny appellant's motion to place M.M. in P.L.'s legal custody is against the manifest weight of the evidence.

CONCLUSION

**{¶64}** Having overruled appellant's sole assignment of error, we affirm the trial court's judgment.

**JUDGMENT AFFIRMED.**

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Pike County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J., and Hess, J.:  Concur in Judgment and Opinion.

For the Court,


BY: _____
Kristy S. Wilkin, Judge

**NOTICE TO COUNSEL**
**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**