[Cite as *In re H.F.*, 2025-Ohio-356.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ATHENS COUNTY

| | | |
|---|---|---|
| In re: H.F. | : | Case No. 24CA19 |
| | : | |
| Adjudicated Dependent Child. | : | <u>DECISION AND</u> |
| | : | <u>JUDGMENT ENTRY</u> |

_____

<u>APPEARANCES:</u>

Christopher Bazeley, Cincinnati, Ohio, for Appellant.

Keller J. Blackburn, Athens County Prosecuting Attorney, and Brittany E. Leach, Assistant Athens County Prosecuting Attorney, Athens, Ohio, for Appellee.

_____

Smith, P.J.

{¶1} Appellant, H.D, the father of minor child, H.F., appeals the judgment of the Juvenile Division of the Athens County Court of Common Pleas terminating his parental rights and placing H.F. in the permanent custody of Athens County Children Services (hereafter "ACCS"). Appellant raises a single assignment of error on appeal, contending that the trial court's decision terminating his parental rights was against the manifest weight of the evidence.[1] However, because we conclude that the permanent custody award is not against the manifest weight of

---

[1] Although the H.F.'s mother's parental rights were also terminated, she has not appealed the judgment.

the evidence, we overrule the sole assignment of error and affirm the juvenile court's judgment.

## FACTS

{¶2} On August 25, 2021, an Ex Parte Order for Emergency Custody was journalized granting ACCS temporary emergency custody of H.F., who at that time was only 13 days old.  The very next day, on August 26, 2021, ACCS filed a complaint alleging that the minor child was abused and dependent because he had tested positive for amphetamines, methamphetamines, benzodiazepines, buprenorphine, marijuana, and fentanyl at birth.  The complaint further stated that the child was born at O'Bleness Hospital in Athens, Ohio, but had to be transferred to Grant Medical Center in Columbus, Ohio, due to the fact that he was suffering from symptoms of withdrawal.  The complaint stated that the child's mother did not have stable housing, had unresolved traffic and criminal charges, had substance abuse issues, and had another child that had been adjudged a dependent child. With respect to Appellant, the complaint alleged that he had failed to establish paternity and had failed to support, visit, or communicate with the child since his birth.  The complaint further alleged that Appellant was incarcerated for aggravated possession of drugs, disrupting public services, and domestic violence, the victim of which was the child's mother.

{¶3} A motion for emergency custody with an affidavit in support was filed the same day and it was granted by the trial court that day. Thereafter, a CASA volunteer was appointed to the case and ACCS filed a case plan which included only the child's mother, as Appellant was expected to be incarcerated for the next three years. An adjudicatory hearing was held on October 19, 2021. Appellant was served but was not present. The child's mother stipulated to a finding of dependency, the allegations of abuse were dismissed, and she also stipulated to temporary custody being awarded to ACCS. As the matter progressed, genetic testing was ordered and Appellant was determined to be the father of the child. A home study was also conducted in attempt to place the child with his maternal grandmother, however, she was found to be unsuitable for placement.

{¶4} ACCS filed a motion to modify the disposition to permanent custody on August 14, 2023. The affidavit filed in support of the motion averred that the child's mother had been recently released from incarceration, that she was currently residing at The Counseling Center, and that she had failed to consistently visit and communicate with the child. It also averred that the mother had an older child that had been adjudicated a dependent child and that was in the custody of its father due, in part, to mother's substance abuse. Further, it averred that Appellant was still incarcerated with an expected release date of April 16, 2024. Appellant subsequently filed a motion seeking a continuance and requesting that he be added

to the child's case plan. Appellant alleged that he was scheduled to be released to transitional control on September 30, 2023, and that he would be eligible for supervised visits beginning in October of 2023. The request for a continuance was denied but Appellant was eventually added to the case plan.

{¶5} The matter came on for hearing as scheduled on October 16, 2023, however, the trial court decided to hold the matter in abeyance at the request of ACCS due to recent progress being made by the child's mother. ACCS thereafter formally amended the case plan to extend the mother's visits in order to support reunification and further amended the case plan to reflect the visits Appellant had been having with the child. Unfortunately, the case plan was updated again on December 14, 2023, to indicate that the child's mother had tested positive for amphetamines and methamphetamines on December 4, 2023.

{¶6} A permanent custody hearing was held on February 13, 2024. ACCS presented the testimony of: (1) Stephanie Blaine, ACCS Kinship Coordinator; (2) Destiny Hooper, ACCS Family Support Worker; and 3) Mary Timms, ACCS Ongoing Caseworker. Blaine testified that despite searching for a relative placement for the child, none was found. She testified that the child's maternal grandmother was found to be an unsuitable placement due to her own criminal history and substance abuse issues, as well as the fact that she was currently on probation and moved around a lot. Hooper testified her role was to supervise or

monitor visitation. She testified that the child's mother had been "kicked off" of the visitation schedule multiple times for missing scheduled visitation. She testified that out of 11 scheduled visits the mother had between November of 2023 to January of 2024, she had only showed up for 3 of them. She testified upon cross-examination that Appellant's first visit with the child was November 7, 2023, and that his visits went very well. She testified that the child warmed up to Appellant, was affectionate with Appellant, and that she did not have any concerns regarding Appellant during the visits.

{¶7} Timms testified that the child was two and one-half years old at the time of the hearing and that he had been in the temporary custody of ACCS for 2 years and 172 days. She testified that the child had been in the same foster home since initially being placed there as an infant. She testified that the child was born with NAS (Neonatal Abstinence Syndrome), and that the child's foster parents ensure he goes to all necessary appointments. She testified that the child requires occupational therapy as well as behavioral therapy. Timms further testified that she had significant concerns regarding the child being placed in the custody of Appellant. Some of her concerns included that Appellant had been incarcerated and ACCS had not been able to assess how he would adapt after being released and that Appellant had been incarcerated for domestic violence committed against the

child's mother while she was pregnant with the child. She was also concerned about the length of time the child had been in the temporary custody of the agency.

{¶8} Timms agreed that Appellant had completed all aspects of the case plan and she testified that he should be commended for that. However, she testified that "at the end of the day," the child needed a place to go. Her recommendation was that permanent custody be granted to ACCS due to the lack of progress on the case plan,[2] the fact that the child had been in the temporary custody of ACCS for 2 years and 172 days, and because there was no other environment that had been assessed as safe for the child to return to at that time. ACCS rested its case after presenting these three witnesses.

{¶9} Appellant thereafter testified, explaining that he had a housing option in Coolville upon release, but that he had concerns about going there due to the people around that area. He said he had no other leads on housing at the time. He testified that he had support people that could help with the child while he worked, including his brother. He testified that his days were consumed with taking classes to better himself. He testified that he had been visiting with the child and the visits had gone great, but that he needed the visits to be longer. He testified that he

---

[2] It should be noted that an overall reading of Timms' hearing testimony indicates that Timms was referring to the general lack of progress on the case plan that led to the filing of the motion for permanent custody. Although Appellant had recently been added to the case plan and had completed the requirements of the case plan, he did so only after the motion for permanent custody had been filed and after the child had been in the temporary custody of ACCS for over two years.

believed the child deserved to be with his family, but he conceded that he had not been present due to incarceration and substance abuse.

{¶10} Finally, the court asked CASA volunteer Tara Huffman to testify. She testified that the child's mother had recently relapsed, having positive drug screens on December 4, 2023 and December 28, 2023.  She testified that the child's mother was currently homeless, having been recently evicted.  She testified that although she understood this was a "12 of 22" case and the child had been in the agency's custody for two and one-half years, she was struggling to recommend terminating parental rights after considering how hard both parents had worked after being released from incarceration.  With respect to Appellant, she testified that she was recommending he be granted "more time," specifically, six more months.  She admitted, however, that she had concerns with the fact that Appellant had been incarcerated for committing domestic violence against the child's mother. She also testified that the child "does amazing" with his foster parents and that the foster parents themselves were "amazing."  Finally, she testified that the child's foster parents intended to adopt the child.

{¶11} The court issued its judgment on July 19, 2024, granting permanent custody to ACCS.  The specific findings made by the court will be discussed in detail below.  Appellant now brings his timely appeal, setting forth a single assignment of error for our review.

ASSIGNMENT OF ERROR

I.      THE TRIAL COURT'S DECISION TERMINATING
        [APPELLANT'S] PARENTAL RIGHTS IS AGAINST
        THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶12} In his sole assignment of error, Appellant contends that the juvenile

court's decision terminating his parental rights is against the manifest weight of the

evidence. More specifically, Appellant argues that the juvenile court erred in

making its best interest determination under R.C. 2151.414(D). ACCS responds

by arguing that clear and convincing evidence was presented which supported a

finding that terminating Appellant's parental rights was in the best interest of the

child.

Standard of Review

{¶13} A reviewing court generally will not disturb a trial court's permanent

custody judgment unless the judgment is against the manifest weight of the

evidence. *E.g., In re R.M.*, 2013-Ohio-3588, ¶ 53 (4th Dist.). When an appellate

court reviews whether a trial court's permanent custody judgment is against the

manifest weight of the evidence, the court " ' " 'weighs the evidence and all

reasonable inferences, considers the credibility of witnesses and determines

whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its

way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " ' " *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist. 2001), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶14} In a permanent custody case, the ultimate question for a reviewing court is "whether the juvenile court's findings ... were supported by clear and convincing evidence." *In re K.H.*, 2008-Ohio-4825, ¶ 43. In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990). "Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *R.M.*, 2013-Ohio-3588, at ¶ 55 (4th Dist.).

{¶15} Once the reviewing court finishes its examination, the court may reverse the judgment only if it appears that the factfinder, when resolving the conflicts in evidence, " 'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial

ordered.' " *Thompkins*, 78 Ohio St.3d at 387, quoting *Martin*, 20 Ohio App.3d at

175. A reviewing court should find a trial court's permanent custody judgment

against the manifest weight of the evidence only in the " 'exceptional case in

which the evidence weighs heavily against the [decision].' " *Id.*; *see* Black's Law

Dictionary (12th ed. 2024) (the phrase "manifest weight of the evidence" "denotes

a deferential standard of review under which a verdict will be reversed or

disregarded only if another outcome is obviously correct and the verdict is clearly

unsupported by the evidence").

{¶16} Moreover, deferring to the trial court on matters of credibility is

"crucial in a child custody case, where there may be much evident in the parties'

demeanor and attitude that does not translate to the record well." *Davis v.

Flickinger*, 77 Ohio St.3d 415, 419 (1997); *accord In re Christian*, 2004-Ohio-

3146, ¶ 7 (4th Dist.). As the Ohio Supreme Court long ago explained:

> In proceedings involving the custody and welfare of
> children the power of the trial court to exercise discretion is
> peculiarly important. The knowledge obtained through contact
> with and observation of the parties and through independent
> investigation can not be conveyed to a reviewing court by printed
> record.

*Trickey v. Trickey*, 158 Ohio St. 9, 13 (1952).

Permanent Custody Framework

{¶17} R.C. 2151.414(B)(1) specifies that a trial court may grant a children

services agency permanent custody of a child if the court finds, by clear and

convincing evidence, that (1) the child's best interest would be served by the award

of permanent custody, and (2) any of the following conditions applies:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> (b) The child is abandoned.
>
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.
>
> (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

In the case at bar, the juvenile court found that R.C. 2151.414(B)(1)(d) applies.

Appellant does not dispute this finding, but instead argues that the juvenile court's

finding that placing the child in the agency's permanent custody was in the child's best interest was against the manifest weight of the evidence.

{¶18} R.C. 2151.414(D)(1) requires a trial court to consider all relevant, as well as specific, factors to determine whether a child's best interest will be served by granting a children services agency permanent custody. The specific factors include: (1) the child's interaction and interrelationship with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes, as expressed directly by the child or through the child's guardian ad litem, with due regard for the child's maturity; (3) the child's custodial history; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.

{¶19} Determining whether granting permanent custody to a children services agency will promote a child's best interest involves a delicate balancing of "all relevant [best interest] factors," as well as the "five enumerated statutory factors." *In re C.F.*, 2007-Ohio-1104, ¶ 57, citing *In re Schaefer*, 2006-Ohio-5513, ¶ 56; *accord In re C.G.*, 2008-Ohio-3773, ¶ 28 (9th Dist.); *In re N.W.*, 2008-Ohio-297, ¶ 19 (10th Dist.). However, none of the best interest factors requires a court to give it "greater weight or heightened significance." *C.F.* at ¶ 57. Instead, the

trial court considers the totality of the circumstances when making its best interest determination. *In re K.M.S.*, 2017-Ohio-142, ¶ 24 (3d Dist.); *In re A.C.*, 2014-Ohio-4918, ¶ 46 (9th Dist.). In general, "[a] child's best interest is served by placing the child in a permanent situation that fosters growth, stability, and security." *In re C.B.C.*, 2016-Ohio-916, ¶ 66 (4th Dist.), citing *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 324 (1991).

{¶20} In the case at bar, Appellant contends that the evidence does not support the court's finding that placing the child in the agency's permanent custody was in the child's best interest. He challenges the trial court's finding as to each best interest factor. Therefore, we will review the trial court's findings related to each factor.

1. Interactions and Interrelationships of the Children

{¶21} R.C. 2151.414(D)(1)(a) requires consideration of the interactions and interrelationships of the children with their parents, caregivers, and others who may significantly affect the children. The juvenile court found that the child, who was two years old at the time of the hearing, was thriving in his foster home, where he was well-bonded and loved by his foster parents, and where he had resided for the majority of his life. The court also found that the child's interactions with his parents had been limited and inconsistent. More specifically, the court found that the child's interaction with his mother "had been spotty to the point that Mother

has been removed from the visitation schedule on more than one occasion[,]" attributing this to mother's continued substance abuse, which the court found "continued to be a barrier for her visitation with her child."

{¶22} With respect to Appellant, the court found that he had been incarcerated since the child's birth and had only recently been released from prison. As such, the court found the child had had limited interaction and that although the court "appreciate[d]" Appellant's love and desire to be with his child, the length of the case as well as the many "unknowns" in Appellant's life, were "not fair to the child and his development." There is competent and credible evidence to support the juvenile court's finding that a consideration of this factor supported a grant of permanent custody to ACCS.

## 2. Wishes of the Children

{¶23} R.C. 2151.414(D)(1)(b) requires consideration of "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." Here, the child was too young to express his wishes and although there was not a guardian ad litem appointed to the case, there was a CASA volunteer appointed who served as a guardian ad litem. The CASA volunteer submitted a report, however, the report only addressed mother's involvement because Appellant was still incarcerated at the time of the report. The CASA volunteer testified at the hearing and updated her report to

make recommendations regarding Appellant's involvement. Ultimately, she recommended that the case be continued to give Appellant six more months to demonstrate his ability to care for the child. The volunteer admitted that she struggled in making the recommendation one way or the other. She also conceded that Appellant had no solid housing plans upon his release from the halfway house. She testified that the child had been in the same foster home since birth, that the foster parents were interested in adopting him, that the child was doing "amazing" in the foster home, and the foster parents were "amazing."

{¶24} This Court has observed that "while guardians ad litem play important roles in child custody matters and in evaluating the interest of children, a trial court is not bound by their recommendations." *In re: K.K.*, 2021-Ohio-3338, fn. 4 (4th Dist.), citing *Gould v. Gould*, 2017-Ohio-6896, ¶ 57 (4th Dist.); *In re R.N.,* 2004-Ohio-4420, ¶ 4 (10th Dist.). Although the child's wishes as expressed through the CASA volunteer tended to favor denying the agency's motion for permanent custody, the trial court was not bound by the volunteer's recommendations. Further, it is clear that the trial court considered this factor in making its final determinations regarding the child's best interests. However, the court simply rejected the CASA volunteer's recommendation, which it was permitted to do.

3. Custodial History

{¶25} R.C. 2151.414(D)(1)(c) requires consideration of the custodial history of the child.  Here, the trial court found that the child had not only been in the agency's custody for 12 of a consecutive 22 month period, it found that the child had been in the agency's custody for 23 months at the time it filed its motion for permanent custody, which was 6 months prior to the final hearing.  Thus, at the time of the hearing, the child had been in the agency's temporary custody for 29 months and, as noted by the court, the child had only been in his parent's custody for a total of 13 days.  The court further found that the child's mother had failed to comply with or benefit from the case plan, and Appellant had been incarcerated prior to the child's birth until shortly before the hearing.  As such, we conclude the evidence at the hearing competently and credibly supported the juvenile court's findings on this factor.

### 4.  Legally Secure Placement

{¶26} R.C. 2151.414(D)(1)(d) requires consideration of the child's need for a legally secure permanent placement.  "Although the Ohio Revised Code does not define the term 'legally secure permanent placement,' this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 2016-Ohio-793, ¶ 56 (4th Dist.), citing *In re Dyal*, 2001 WL 925423, *9 (4th Dist. Aug. 9, 2001) (implying that "legally secure permanent placement" means a "stable, safe, and nurturing

environment"); *see also In re K.M.*, 2015-Ohio-4682, ¶ 28 (10th Dist.) (observing

that legally secure permanent placement requires more than stable home and

income but also requires environment that will provide for child's needs); *In re*

*J.H.*, 2013-Ohio-1293, ¶ 95 (11th Dist.) (stating that mother was unable to provide

legally secure permanent placement when she lacked physical and emotional

stability and that father was unable to do so when he lacked grasp of parenting

concepts); *In re J.W.*, 2007-Ohio-2007, ¶ 34 (10th Dist.) (Sadler, J., dissenting)

(stating that a legally secure permanent placement means "a placement that is

stable and consistent"); Black's Law Dictionary (6th Ed. 1990) (defining "secure"

to mean, in part, "not exposed to danger; safe; so strong, stable or firm as to insure

safety"); *Id.* (defining "permanent" to mean, in part, "[c]ontinuing or enduring in

the same state, status, place, or the like without fundamental or marked change, not

subject to fluctuation, or alteration, fixed or intended to be fixed; lasting; abiding;

stable; not temporary or transient"). Thus, "[a] legally secure permanent

placement is more than a house with four walls. Rather, it generally encompasses

a stable environment where a child will live in safety with one or more dependable

adults who will provide for the child's needs." *M.B.* at ¶ 56.

{¶27} Here, there is ample clear and convincing evidence showing that

neither Appellant nor the child's mother can provide the child with a legally secure

permanent placement. The child was removed from the mother's custody less than

two weeks after his birth, on August 25, 2021, because he tested positive at birth for amphetamines, methamphetamines, benzodiazepines, buprenorphine, marijuana, and fentanyl. At the time the permanent custody motion was filed on August 14, 2023, mother had been released from incarceration but was residing at The Counseling Center. Further, Appellant was incarcerated at the time of the child's birth for domestic violence, the victim being the child's mother. He remained incarcerated at the time the motion for permanent custody was filed nearly two years later. Although Appellant had been released from prison at the time of the permanent custody hearing on February 13, 2024, he was still residing in a halfway house. Moreover, the agency investigated but failed to find any relative placement options that were acceptable.

{¶28} The juvenile court found that the minor child desperately needed a secure and permanent placement which could not be achieved unless ACCS was granted permanent custody. The court found that "unknowns" related to whether or not mother would remain sober and whether or not Appellant would be able to maintain a law-abiding life while providing for the child's basic needs would result in the child being in limbo for additional time after already being in limbo for over two years. The court further found that although Appellant expressed a willingness to be a parental figure for the child, there were unanswered questions related to

"housing instability" and Appellant's "ability to provide * * * for the child's needs as well as protection."

{¶29} Appellant has not cited any authority that required the court to continue the child in the agency's temporary custody while he completed his stay at a halfway house, and then further continue the case to see if Appellant would be able to obtain suitable housing and arrange for suitable caregivers, when the remaining evidence indicated that the child's best interest would be served by placing him in the agency's permanent custody. *See generally In re K.M.*, 2014-Ohio-4268, ¶ 9 (9th Dist.) ("If permanent custody is in the child's best interest, legal custody or placement with [a parent or other relative] necessarily is not."). We conclude the evidence at the hearing competently and credibly supported the court's findings on this factor as well.

### 5. Factors in R.C. 2151.414(E)(7) to (E)(11)

{¶30} Although the court did not make any express findings related to these factors, it stated it had considered these factors in reaching its decision. Appellant does not specifically challenge any findings related to these factors other than to state they are not applicable. We agree with Appellant's assessment that these factors do not apply to the present case.

Conclusion

{¶31} We conclude that the juvenile court's best interest finding is not against the manifest weight of the evidence. ACCS presented competent and credible evidence upon which the court reasonably could have formed a firm belief that grant of permanent custody to the agency was in the best interest of the child. As set forth above, although two of the factors arguably weighed in favor of denying the agency's motion, the other three factors weighed heavily in favor of granting permanent custody to the agency. Thus, the record demonstrates that the court considered the totality of the circumstances when making its best interest determination. Therefore, we conclude the permanent custody award is not against the manifest weight of the evidence. Accordingly, Appellant's sole assignment of error is overruled and the judgment of the juvenile court is affirmed.

**JUDGMENT AFFIRMED.**

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Athens County Common Pleas Court – Probate-Juvenile Division to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J., and Wilkin, J. concur in Judgment and Opinion.


For the Court,

_____

Jason P. Smith
Presiding Judge


### **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**